**UNITED STATES, Appellee,**

v.

**Julio C. SANTANA, Defendant, Appellant.**

**Nos. 97–1604, 97–1617.**

United States Court of Appeals, First Circuit.

Heard Feb. 4, 1999.

Decided April 21, 1999.

Robert A. Costantino for appellant.

Heidi E. Brieger, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, was on brief for appellee.

Before SELYA, Circuit Judge, BOWNES, Senior Circuit Judge, and LIPEZ, Circuit Judge.

LIPEZ, Circuit Judge.

Julio C. Santana appeals his convictions for conspiracy to possess cocaine base with intent to distribute in violation of 21 U.S.C. § 846 and for possession of cocaine base with intent to distribute in violation of 21 U.S.C. § 841. On appeal Santana challenges, *inter alia*, the court's decision to accede to the jury's request after the close of evidence and during its deliberations to return to the courtroom and observe Santana's ears, which had been covered by headphones used for Spanish translation throughout the course of the trial, and the sufficiency of the evidence. Although we find that there was sufficient evidence to convict Santana, we conclude that the court committed reversible error by allowing the jury to observe Santana's ears during its deliberations, and hence to consider extrinsic information not properly admitted during the trial. Accordingly, we vacate the judgment.[1]

## I.

We recite the facts in the light most favorable to the verdict, consistent with support in the record. *See United States v. Santiago*, 83 F.3d 20, 22 (1st Cir.1996). In 1994 the United States Drug Enforcement Administration ("DEA"), working in conjunction with the Worcester Police Department ("WPD"), began a year-long investigation of cocaine, crack, and heroin trafficking in Worcester, Massachusetts. The government was assisted in its investigation by Dien Van Huynh ("Huynh"), a confidential informant who agreed to engage in controlled purchases of drugs from suspected drug dealers. During the course of the investigations and prosecutions, the DEA paid Huynh a salary and reimbursed his expenses.

On November 8, 1994, DEA agents outfitted Huynh with a hidden monitoring device and gave him $2,000 to purchase two ounces of crack cocaine from a suspected drug dealer named Rudy Matos. As surveillance agents watched from a nearby location, Huynh waited for Matos at a local donut shop. Matos arrived in a blue Mazda, spoke briefly with Huynh from his car, and drove away. Fifteen minutes later Matos returned driving a black Mazda, spoke briefly with Huynh, and drove away again. After another fifteen minutes elapsed, Matos returned, this time driving a brown Datsun. Matos and Huynh then left together in the Datsun and traveled to a parking lot next to an apartment complex on Vernon Street in Worcester. As they sat in the parking lot, Matos told Huynh that his (Matos's) source for the crack cocaine drove a red Toyota 4–Runner with tinted windows.

Shortly thereafter a red Toyota 4–Runner with tinted windows registered to Julio Santana pulled into a parking lot next to the apartment complex. Matos entered the passenger's side of the 4–Runner, stayed for a moment, and then returned to the Datsun. Matos informed Huynh that the driver of the 4–Runner had only an ounce and a half of crack cocaine instead of the two ounces that Huynh had requested. Huynh agreed to purchase the smaller amount. Matos re-entered the 4–Runner, then exited and returned to the Datsun with the drugs in his pocket. Matos and Huynh drove away in the Datsun, followed by surveillance agents.

---

1. Santana also challenges his sentence and the court's failure to suppress sua sponte a confidential informant's testimony, which he contends was obtained by the government through monetary payments in violation of the so-called "anti-gratuity" statute, 18 U.S.C. § 201(c)(2). Because we vacate the convictions, we have no occasion to consider these issues.

In an effort to identify the occupant of the 4–Runner, Special Agent Brian Tomasetta had parked his surveillance vehicle in a position that would permit observation of the 4–Runner's driver "head-on" through the untinted front windshield as the vehicle departed the area. Agent Tomasetta identified Santana at trial as the person he had observed driving the 4–Runner, and recalled that the vehicle's sole occupant was

> a ... male ..., non-Caucasian, or non-white. He was in his late 20s to early 30s. Very distinctive looking to me. By that I mean that he had close-cropped hair, very neat in appearance looking, possibly a mustache. *And he had protruding ears or ears that stuck out.* It was something that stuck out in my mind.

About twenty minutes after Agent Tomasetta observed the 4–Runner's driver as the vehicle left the Vernon Street location, he and WPD Sergeant Richard Burgos drove to J & M Telecommunications, a business owned by Santana. The 4–Runner was parked in front of the business, and a man was standing next to it. Agent Tomasetta remarked to Officer Burgos that this man was the same person he had seen twenty minutes earlier driving the 4–Runner away from the Vernon Street location. Officer Burgos, who knew Santana from prior dealings, stated that the man was Santana.

Several months later, on February 23, 1995, government agents executed a controlled purchase of heroin from Matos at his home at 57 Outlook Drive in Worcester. Working undercover and wearing a monitoring device, Agent Tomasetta purchased three ounces of heroin from Matos, and at the same time placed an order for

crack cocaine to be delivered on short notice. A court-authorized pen register [2] indicated that minutes after Agent Tomasetta left 57 Outlook Drive, there was a call from that location to J & M Telecommunications, Santana's business. Surveillance agents then followed Matos to several locations, including J & M Telecommunications, where they observed Matos meet Santana at the door and enter the store with him. Approximately two hours later, Matos met again with Agent Tomasetta at 57 Outlook Drive, where he sold Tomasetta two ounces of crack cocaine.

Finally, on March 23, 1995, government agents planned another controlled purchase of crack cocaine from Matos. Equipped with a hidden transmitter and $3,000 in government funds, Huynh once again met Matos near the Worcester donut shop. During this meeting, Matos assured Huynh that the crack cocaine would be of good quality because his supplier was the "same guy, red truck." This transaction was never completed because Matos demanded more money than Huynh was authorized to pay.

In September 1995 a federal grand jury returned an indictment charging Santana and Matos with conspiring to possess cocaine base with intent to distribute, in violation of 21 U.S.C. § 846, and with possession of cocaine base with intent to distribute, in violation of 21 U.S.C. § 841.[3] Matos pleaded guilty and has not appealed his sentence. In the first prosecution against Santana, the jury was unable to reach a verdict and the case ended in a mistrial. At a second trial in April 1996, the jury found him guilty on both counts. The district court sentenced Santana to a 120 month term of incarceration followed

---

**2.** A government witness explained at trial that a pen register records the outgoing telephone numbers dialed from a particular phone line, as well as the duration and time of such calls. A pen register can also trace the telephone number from which an incoming call was placed, provided the caller has not "blocked" the number.

**3.** A third count alleging that Santana and Matos conspired to possess heroin with intent to distribute in violation of 21 U.S.C. § 846 was severed and later dismissed.

by a 96 month term of supervised release. This appeal followed.

## II.

■ Santana challenges the sufficiency of the evidence against him, arguing essentially that the government failed to introduce any direct evidence that it was he who sold the crack cocaine to Matos on either November 8, 1994, or on February 23, 1995. Although Santana moved unsuccessfully for a judgment of acquittal at the close of the government's case, he did not renew the motion after presenting evidence. *See* Fed.R.Crim.P. 29. Accordingly, our review is limited to the prevention of clear and gross injustice. *See United States v. Santiago,* 83 F.3d 20, 23 (1st Cir.1996); *United States v. Taylor,* 54 F.3d 967, 975 (1st Cir.1995); *United States v. Clotida,* 892 F.2d 1098, 1102–03 (1st Cir.1989).

■ In evaluating Santana's sufficiency challenge, we must determine whether the evidence, taken in the light most favorable to the government—a perspective that requires us to draw every reasonable inference and to resolve credibility conflicts in a manner consistent with the verdict—would permit a rational trier of fact to find each element of the crimes charged beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Santiago,* 83 F.3d at 23. The government can meet this burden by either direct or circumstantial evidence, or by any combination of the two. *See id.*; *United States v. Boylan,* 898 F.2d 230, 243 (1st Cir.1990); *United States v. Campa,* 679 F.2d 1006, 1010 (1st Cir. 1982). Moreover, the government need not disprove every hypothesis consistent with the defendant's innocence; rather, it is enough that "a rational jury could look objectively at the proof and supportably conclude beyond a reasonable doubt that the defendant's guilt has been established." *United States v. Ingraham,* 832

F.2d 229, 240 (1st Cir.1987); *see United States v. Echeverri,* 982 F.2d 675, 677 (1st Cir.1993).

■ Although the government introduced no physical or testimonial evidence establishing directly that it was Santana who sold the crack cocaine to Matos,[4] the government presented sufficient evidence to support the convictions. Huynh's testimony and a recorded conversation between Huynh and Matos established that the crack cocaine supplier drove a red 4–Runner. There was evidence that on November 8 a red 4–Runner registered to Santana entered the Vernon Street parking lot, and that Matos purchased crack cocaine from the vehicle's driver. Agent Tomasetta identified the driver as Santana. This identification, although vigorously challenged by the defense, directly tied Santana to the drug transaction. The government also introduced evidence that on February 23, after Agent Tomasetta placed an unexpected order for crack cocaine with Matos, a call was placed from Matos's residence to Santana's business; that Matos then went to Santana's business; and that within about two hours after the order was placed Matos sold Tomasetta the crack cocaine. In these circumstances, we cannot conclude that the jury's verdict, on sufficiency of the evidence grounds, represented a clear and manifest injustice.

■ For the purpose of our sufficiency analysis, we of course limit our review to evidence that was properly before the jury. Thus, our analysis does not take into consideration the appearance of Santana's ears as corroborative of Agent Tomasetta's identification, the issue to which we now turn.

## III.

■ Santana argues that the court committed reversible error by acceding to the jury's request, after the close of evidence and during its deliberations, to return to

---

**4.** Although Matos pleaded guilty, he did not testify at Santana's trial.

the courtroom and observe Santana's ears, which had been covered during the trial by headphones used for Spanish translation. We agree that the court erred by allowing the jury to consider extrinsic information not properly admitted during the trial, and that the error was not harmless.

The Spanish-speaking Santana wore the headphones throughout the trial, even during at least one period when he had waived his right to have an interpreter present. Although Santana pressed a "misidentification" theory (suggesting that it was actually Matos's brother who had been behind the wheel of the 4–Runner as it left the Vernon Street location on November 8), and although Agent Tomasetta—the only prosecution witness who had observed the driver of the 4–Runner on November 8— cited the driver's "protruding" ears as a distinguishing characteristic, the prosecution did not ask Santana to remove his headphones at any time during the trial, including during Tomasetta's in-court identification of Santana. During its deliberations, the jury sent this note to the judge: "May we see the defendant once without his headphones on?" The judge granted the jury's request over the defense's objection, reasoning:

> First of all, he had no right to have [the headphones] on this morning since you waived the right to an interpreter. That was just a disguising thing. More importantly, I was frankly surprised that throughout the course of the last trial that no one asked, neither the government nor the jury asked, for it because the whole issue here has been the ears. It's not testimony; it's just who he is. No one should be better off just because you speak Spanish, neither a better or worse position. Since [Santana's] ears were a prominent factor, I think in the interest of justice I will allow it.

The jury then entered the courtroom, observed Santana without his headphones for about thirty seconds, and returned to their deliberations. The judge noted for the record: "I didn't say anything. Primarily it was because there was nothing to say and also because the interpreter wasn't here. I minimized it." The following day the jury returned guilty verdicts on both counts.

■■■■ Our analysis of the judge's response to the jury's note requires a proper characterization of the court's decision. Citing *United States v. Rivera–Santiago*, 107 F.3d 960 (1st Cir.1997), *United States v. Aubin*, 961 F.2d 980, 983 (1st Cir.1992), and *United States v. Hyson*, 721 F.2d 856, 865 (1st Cir.1983), the government characterizes the court's decision as simply one that "handled a jury question," reviewable for abuse of discretion. We disagree. *Rivera–Santiago*, *Aubin*, and *Hyson* addressed the proper standard of review to be applied to a court's handling of juror requests to have *previously admitted* testimony re-read during deliberations. Such decisions are reviewed under an abuse of discretion standard. *See Hyson*, 721 F.2d at 865; *see also United States v. Gonzales*, 121 F.3d 928, 944–45 (5th Cir.1997) (applying abuse of discretion standard to court's decision to allow jury to inspect machinegun, where machinegun was properly admitted in evidence during the trial); *United States v. Rincon*, 28 F.3d 921, 926 (9th Cir.1994) (applying abuse of discretion standard to court's decision to allow jurors to view defendant next to surveillance photograph that was admitted during the trial). The jury's request in the instant case, however, did not pertain to evidence that was presented during the course of the trial.[5] To the contrary, Santana's ears had been hidden during the entire trial by the court-authorized headphones, and the government did not request at any time that

---

**5.** We reject the government's contention, made in passing at oral argument, that the appearance of Santana's ears was already in evidence because surveillance photographs, including surveillance photographs allegedly of Santana, were admitted in evidence during the trial. The in-person appearance of Santana's ears, a form of physical evidence, was not in evidence.

he remove the headphones to allow the jury to see his ears.[6] The jury's request, therefore, related to information extrinsic to the closed record. For this reason, we find inapposite the authorities cited by the government in support of an abuse-of-discretion standard.

 Santana takes a different approach, characterizing the court's decision to allow the jury to observe him without his headphones after the close of all evidence as a "reopening" of the case. A court's decision to reopen a case after the close of evidence to permit the introduction of additional evidence is also reviewable for abuse of discretion. *See Lussier v. Runyon*, 50 F.3d 1103, 1113 (1st Cir.1995); *United States v. Blankenship*, 775 F.2d 735, 740–41 (6th Cir.1985); *see also United States v. Pandozzi*, 878 F.2d 1526, 1534 (1st Cir.1989) (district court did not act beyond its lawful powers by allowing prosecution to reopen its case). This rule applies even when the district court reopens the case on its own initiative, rather than on the motion of one of the parties. *See Lussier*, 50 F.3d at 1113 (citing *Calage v. University of Tenn.*, 544 F.2d 297, 301–02 (6th Cir.1976)); *see also Maggard v. Wainwright*, 432 F.2d 941, 942 (5th Cir.1970).

In this instance, however, the court did not "reopen" the case, as that term is commonly understood. Rather, the court permitted the jury to consider information extrinsic to the closed record without the formalities attendant to a reopening of the case. The distinction between a "reopening" of a case and the consideration of extrinsic evidence was at issue in *Lussier v. Runyon*. In that case, the district court ordered the parties, after they had rested, to submit factual information regarding the plaintiff's disability retirement annuity that was germane to his claim. *See Lussier*, 50 F.3d at 1106, 1113. The court char-

acterized its order as a "reopening" of the case. *See id.* at 1115 n. 16. We disagreed:

> [T]he district court—despite what it said—did not reopen the record; instead, the court, over the plaintiff's objection, engaged in a unilateral pursuit of additional evidence without affording the parties the standard prophylaxis that generally obtains at trial.
>
> . . .
>
> Ours is a system that seeks the discovery of truth by means of a managed adversarial relationship between the parties. If we were to allow judges to bypass this system, even in the interest of furthering efficiency or promoting judicial economy, we would subvert this ultimate purpose. . . . [J]udges may not defenestrate established evidentiary processes, thereby rendering inoperative the standard mechanisms of proof and scrutiny, if the evidence in question is at all vulnerable to reasonable dispute.

*Id.* at 1113, 1114. Although *Lussier* was a civil case, we think its basic reasoning applies with even greater force in the criminal context. In this case, the court permitted the jury to file back into the courtroom to observe Santana's ears without affording the defendant any of the procedural protections of a criminal trial. There was no opportunity for further cross-examination of prosecution witnesses or for the defense to introduce rebuttal evidence; Santana's interpreter was not present; the parties were not permitted to make additional arguments to the jury; and the court itself acknowledged that it purposely "minimized" the occasion. In these circumstances, the propriety of the court's decision to allow the jury to consider extrinsic information is not governed by the deferential abuse of discretion standard applied when the court permits a case

---

**6.** In urging us to affirm Santana's conviction, the government notes that it could have asked *the court to direct Santana to remove his headphones and display his ears to the jury at any time during the trial. Although that is true, see, e.g., Holt v. United States*, 218 U.S. 245, 252, 31 S.Ct. 2, 54 L.Ed. 1021 (1910), the government did not do so. For present purposes *we are not concerned with what the government could have done or should have done during the trial.*

to be reopened after the close of evidence. Rather, the decision was subject to de novo review and it is error per se.

 The court's approval of the jury's request to consider information outside the record makes this case unusual.[7] Most such cases involve extrinsic information reaching jurors as a result of inadvertence, *see, e.g., United States v. Greene,* 834 F.2d 86, 87–89 (4th Cir.1987), or juror misconduct, *see, e.g., Lacy v. Gardino,* 791 F.2d 980, 982–83 (1st Cir.1986). The origin of the extrinsic information, however, does not alter our analysis. The jury's exposure during its deliberations to extrinsic information, whatever its source, is an error of constitutional proportions that is grounds for setting aside the verdict, unless the exposure was harmless.[8] *See United States v. Williams,* 809 F.2d 75, 80–81 (1st Cir.1986); *Lacy v. Gardino,* 791 F.2d 980, 983 (1st Cir.1986); *see also Eslaminia v. White,* 136 F.3d 1234, 1237 (9th Cir.1998); *United States v. Gonzales,* 121 F.3d 928, 944–45 (5th Cir.1997); *United States v. Barnes,* 747 F.2d 246, 250–51 (4th Cir.1984). Such exposure to extrinsic information deprives a criminal defendant of the protections of the Sixth Amendment, including his right of confrontation, of cross-examination, and of counsel. *See Lacy,* 791 F.2d at 983 (citing *Turner v. Louisiana,* 379 U.S. 466, 472–73, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965))(juror's peeling tape off exhibits and revealing information about defendant's criminal record created an error of constitutional proportions); *Eslaminia,* 136 F.3d at 1237 (jury's exposure to tape recorded interview of defendant that was not admitted in evidence deprived defendant of Sixth Amendment rights); *see also United States v. Hans,* 738 F.2d 88, 93 (3d Cir.1984). While we recognize the unusual nature of the jury's request, and while we understand the able trial judge's frustration with Santana's use of his headphones when they were not needed and the government's failure to request that he display his ears to the jury notwithstanding their obvious import to the case, the judge should not have intervened by allowing the jury to observe Santana's ears after the close of evidence and without the standard safeguards of a criminal trial.[9]

 The presence of constitutional error, however, does not necessarily require reversal. *See Lacy,* 791 F.2d at 983; *United States v. Williams,* 809 F.2d 75, 81 (1st Cir.1986). A jury's consideration of extrinsic information is susceptible to harmless-error analysis, *see Lacy,* 791 F.2d at 983, and an error will be deemed harmless if "the beneficiary of ... [the] constitutional error [can] prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *see also Williams,* 809 F.2d at 81

---

7. The jury's consideration of extrinsic information with the court's blessing is not unprecedented, however. *See, e.g., United States v. Hans,* 738 F.2d 88, 91–93 (3d Cir.1984) (court granted jury's request to inspect windbreakers which were not admitted in evidence).

8. We emphasize that, here, the jury was exposed to new information of a factual nature, material to an issue in the case. This is to be distinguished from situations in which a court supplies a deliberating jury, upon its request, with a tool, such as a magnifying glass, to aid it in the due examination of evidence previously admitted during the trial. *See, e.g., United States v. George,* 56 F.3d 1078, 1084

(9th Cir.1995); *United States v. Young,* 814 F.2d 392, 396 (7th Cir.1987).

9. We are not persuaded by the government's contention that Santana's failure to ask the court to allow him to respond to the new evidence is fatal to his claim. Given the novelty of the situation, as well as the risk of a mistrial if the jury's deliberations were interrupted by a continuance, we will not preclude Santana from making his argument of prejudice simply because he did not think to ask for a continuance. Santana adequately preserved the issue for appellate review by making a timely objection to the court's decision to allow the jury to re-enter the courtroom to observe his ears during deliberations.

n. 2.[10] Thus, the jury's consideration of extrinsic information raises a presumption of prejudice, *see Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954), and the government bears the burden of showing beyond a reasonable doubt that the extrinsic information did not contribute to the conviction, *see Williams*, 809 F.2d at 81.[11] In order to determine whether the jury's consideration of extrinsic evidence was harmless error, a reviewing court must "assess the record as a whole to determine the impact of the improper evidence upon the jury.... The prejudicial effect of the improper evidence must be weighed against the weight of the properly admitted evidence." *Lacy*, 791 F.2d at 986 (quoting *Morgan v. Hall*, 569 F.2d 1161, 1166 (1st Cir.1978)); *see also United States v. Weiss*, 752 F.2d 777, 783 (2d Cir.1985) (possibility of prejudice is assessed "by reviewing the entire record, analyzing the substance of the extrinsic evidence, and comparing it to that information of which the jurors were properly aware").

Our harmless error analysis thus begins with an examination of the nature of the extrinsic information to which the jury was exposed to determine its potential prejudicial effect. As the government points out, the type of extrinsic information in this case—namely, the appearance of Santana's ears—is unusual in that it is a static, inherent characteristic not subject to dispute in the classic sense that testimonial, documentary, or other physical evidence might be.[12] There is no question, however, that the appearance of Santana's ears was physical evidence tending to corroborate Agent Tomasetta's identification of him as the individual he had observed driving the 4-Runner on November 8th—just as a defendant's tattoo, scar, gold tooth, or other identifying characteristic visible to a witness but not visible to a jury during a trial would become evidence only if the defendant was asked to display the characteristic to the jury. To the extent that the appearance of Santana's ears was consistent with Agent Tomasetta's description of the person he had observed on November 8th, the display of his ears was powerful evidence damaging to the defense. If the government had requested that the display take place in the context of the trial (as would have been its prerogative, *see supra* note 6), with the standard protections available to a criminal defendant, much of this damage might have

10. In *Williams*, we noted that the courts of appeals have applied many different formulations of the standard of review that appellate courts should apply to a review of the prejudicial effect of the jury's consideration of extrinsic material. *See Williams*, 809 F.2d at 81 n. 2; *see, e.g., United States v. Hall*, 116 F.3d 1253, 1255 (8th Cir.1997) (appropriate inquiry is whether there is any "reasonable chance" that the jury would have been deadlocked or would have reached a different verdict but for the prejudicial extraneous material); *United States v. Jaramillo*, 98 F.3d 521, 525 (10th Cir.1996) (a new trial is warranted if there was the "slightest possibility" that viewing the unadmitted evidence affected the verdict); *United States v. Rincon*, 28 F.3d 921, 926 (9th Cir.1994) (when extrinsic evidence is presented to a jury, the defendant is entitled to a new trial if there exists a "reasonable possibility" that the extrinsic material could have affected the verdict); *United States v. Howard*, 506 F.2d 865, 869 (5th Cir.1975) (standard is whether there is a "reasonable possibility" of prejudice). In this circuit, our formulation of the standard requires us to find the extrinsic material harmless beyond a reasonable doubt. *See Williams*, 809 F.2d at 81 n. 2. This standard is interchangeable with the "reasonable possibility" standard used by some other circuits. *See id.; see also United States v. Bagley*, 641 F.2d 1235, 1240–41 (9th Cir.1981).

11. Because we conclude that the court's decision to allow the jury to observe Santana without his headphones after the close of evidence was an error of constitutional dimensions, we reject the government's contention that the standard of harmless error review for non-constitutional error, *see United States v. Rose*, 104 F.3d 1408, 1414 (1st Cir.1997), is appropriate here.

12. This distinction seems to underlie the district court's statement when deciding to allow the jury to observe Santana without his headphones after the close of evidence: "It's not testimony; it's just who he is."

been mitigated through cross-examination, by calling other witnesses, or in closing argument to the jury. Not surprisingly (given the government's failure to request the court to direct that Santana display his ears to the jury during the trial), defense counsel did not focus particular attention on Agent Tomasetta's description of the suspect's "protruding ears" in his cross-examination of Tomasetta or in his closing argument to the jury.

Moreover, the connection between the extrinsic information at issue here—the appearance of Santana's ears—and an issue material to and disputed throughout the trial—the identity of the person who supplied crack cocaine to Matos—is unmistakable. *Cf. United States v. Johnson,* 647 F.2d 815, 817 (8th Cir.1981) (affirming conviction, notwithstanding jury's exposure to extrinsic information, where the information was not relevant to any issue in the case); *United States v. McKinney,* 429 F.2d 1019 (5th Cir.), *modified & rev'd on reh'g,* 434 F.2d 831 (5th Cir.1970)(same). Because no direct evidence was introduced to establish that Santana was the person who supplied the crack cocaine, the government's case hinged largely on Agent Tomasetta's identification of Santana as the person he observed driving the 4–Runner away from the drug transaction on November 8th. The extrinsic information at issue here was a critical component of Tomasetta's identification. The district court itself noted the importance of the appearance of Santana's ears as corroborative of Tomasetta's identification, stating: "I was frankly surprised that throughout the course of the last trial no one asked, neither the government nor the jury asked, for it because the whole issue here has been the ears."

Nor was the government's case against Santana so overwhelming as to overshadow the prejudicial effect of the jury's exposure to information extrinsic to the record during its deliberations. *Cf. United States v. Hall,* 116 F.3d 1253, 1255 (8th Cir.1997) (affirming conviction notwithstanding jury's consideration of extrinsic information, and noting the strength of the government's case); *United States v. Bagnariol,* 665 F.2d 877, 889 (9th Cir.1981) (noting "vast body of evidence presented by the government"); *McKinney,* 434 F.2d at 833 (affirming conviction where evidence was overwhelming). Other than Agent Tomasetta's identification of Santana as the person he had observed driving the 4–Runner on November 8, 1994, the government's evidence against Santana consisted primarily of the following: (1) the November 8 drug transaction took place in a vehicle registered in his name, and law enforcement officers observed Santana twenty minutes after the transaction standing next to the vehicle in front of his business; (2) on February 23, 1995, Matos called, then visited, Santana's business shortly after an unexpected drug order was placed; and (3) on March 23, 1995, Matos told Huynh that the crack cocaine would be of good quality because his supplier was the "same guy, red truck."

Indeed, the government conceded at oral argument that in the first prosecution of Santana, when the jury was unable to reach a verdict, the government presented the same quantum of evidence that it presented at the second trial. The jury deliberations in the second trial spanned three days, again suggesting the difficulty of the deliberations. Moreover, because the jurors specifically asked to observe Santana without his headphones, they obviously deemed such evidence important to their deliberations. *See United States v. Luffred,* 911 F.2d 1011, 1014–15 (5th Cir. 1990); *United States v. Hans,* 738 F.2d 88, 92–93 (3d Cir.1984). In these circumstances, it is impossible to conclude beyond a reasonable doubt that the court's error in allowing the jury to observe Santana without his headphones during its deliberations did not contribute to the verdict. Accordingly, we vacate the conviction and remand the case for a new trial.

***It is so ordered.***