**UNITED STATES of America,**

v.

**Leo V. FELTON and Erica Chase, Defendants.**

**No. CR. 01–10198–NG.**

United States District Court, D. Massachusetts.

Jan. 3, 2003.

Timothy G. Watkins, Federal Defender's Office, Lenore Glaser, Law Office of Lenore Glaser, Boston, for Erica Chase (1), Leo V. Felton (2), Defendants.

S. Theodore Merritt, Emily R. Schulman, United States Attorney's Office, Boston, for U.S. Attorneys.

*MEMORANDUM AND ORDER RE: MOTION BY DEFENDANT LEO FELTON FOR POST–VERDICT COMMUNICATION WITH THE JURORS*

GERTNER, District Judge.

### I. *INTRODUCTION*

This memorandum concerns the circumstances under which a court is obliged to look below the surface of a jury's verdict.

We hold a jury's verdict to be sacrosanct. They have the right to "carry on deliberations in secret and to report out their final judgment without giving reasons for it." Harry Kalven, Jr. and Hans Zeisel, *The American Jury 3*, (1971). That approach is part and parcel of the "deep commitment to the use of laymen in the administration of justice..." *Id.*

After a jury found Leo Felton and Erica Chase guilty of multiple charges on July 26, 2002, Mr. Felton filed a Motion for Post–Verdict Communication With the Jurors [document # 176] essentially based on counsel's speculation that the jury's verdict was tainted by exposure to pretrial publicity or other extrinsic information. This submission, however, did not raise issues sufficient to justify recalling jurors for questioning. However, shortly after the verdict facts came to the Court's attention which were more troubling. When the Court met with the jurors to thank them for their service, one juror ("Juror A")[1] made a comment which suggested exposure to very specific information about Mr. Felton's criminal history, information not part of the trial record. I informed the parties of my concerns by sealed letter and invited them to submit responses and to propose what further action, if any, the court should take.

After considering the parties' submissions, I interviewed Juror A in the presence of the parties on September 17, 2002. Based on the content of that interview, and after reviewing further sealed submissions from the parties, on September 25, 2002, I interviewed a second juror ("Juror B"), also in the presence of the parties. After that proceeding, I concluded that the jurors had not, in fact, received extrinsic information. I therefore endorsed Mr.

Felton's Motion for Post–Verdict Communication With the Jurors as "**GRANTED** in part, **DENIED** in part"—granted to the extent of inquiry already conducted, and denied as to the ultimate relief.

I write briefly to describe what happened and to explain my legal conclusions for the record.

## II. *PROCEDURAL AND FACTUAL HISTORY*

### A. *The Voir Dire Process*

In a case marked by extensive public interest and pre-trial publicity, the government charged Mr. Felton and Ms. Chase with a number of serious crimes: conspiracy to make and possess an unregistered destructive device (Count One); receipt of explosives with intent to kill or injure persons or damage property (Count Two—Felton only); possession of a firearm in furtherance of a crime of violence (Count Three); possession of a firearm (Counts Four and Five—Felton only); conspiracy to make and pass counterfeit notes (Count Seven); conspiracy to obstruct justice (Count Eight); obstruction of justice (Counts Nine and Ten); conspiracy to commit bank robbery and/or to interfere with commerce by robbery (Count Eleven—Felton only); and bank robbery (Count Twelve—Felton only).

In addition to the accusations that the defendants took certain actions to acquire explosives and commit other illegal acts, the government alleged a particular motive: The government claimed that defendants engaged in their criminal activities in support of a broad agenda of white supremacy, and that they hoped to ignite "racial holy war" through execution of as-yet unspecified violent terrorist actions.

---

**1.** In order to protect the privacy of the jurors involved, I do not identify them in this un-sealed Memorandum.

Because of the extensiveness of the publicity and the inflammatory nature of the accusations, I allowed the parties to use every jury selection device available to select a fair jury. First, each juror filled out a lengthy questionnaire prepared by the parties. Second, I permitted individual voir dire by counsel. Third, I allowed additional defense peremptory challenges; and finally I admonished the jurors daily not to consider any information about the case from outside the courtroom. Five of the twelve jurors and three of the four alternates stated during voir dire that they had been aware of some pre-trial publicity, but counsel neither moved to challenge these jurors for cause nor used peremptory strikes to remove them.

### B. *Post Verdict*

After a ten-day trial, the jury acquitted Ms. Chase of Count Seven (conspiracy to make and pass counterfeit notes). The jury found the defendants guilty on all of the other charged counts. I subsequently dismissed Count Three notwithstanding the verdict because the evidence was legally insufficient to find that the firearm discovered in the defendants' apartment was actually possessed *"in furtherance"* of a crime of violence (here, the explosives charges). *United States v. Chase,* 221 F.Supp.2d 209, 221 (D.Mass.2002).

After the verdict, I asked the jurors if they wished to speak with counsel in my presence. They declined. I then went to the jury room to thank the jurors personally and to address other issues, notably, how to deal with efforts by the press to speak with them. In addition, I asked if anyone had any questions about the proceedings. One juror asked, "What had Mr. Felton been [previously] convicted of, that led to his [earlier] imprisonment?" Before I could answer, Juror A, said, "Attempted Murder."

The comment was significant: Juror A was *not* one of the jurors who had admitted to seeing publicity about the case prior to trial. Juror A did not disclose in either [his/her] questionnaire or in [his/her] voir dire that [he/she] had read, seen, or heard anything about the case prior to trial. While the *fact* of Mr. Felton's previous imprisonment had been introduced during the trial, because he joined white supremacist organizations and began planning his criminal activities while still incarcerated, the *nature* of the crime for which he was imprisoned had never been admitted into evidence.

### C. *Felton's Post–Verdict Submissions*

On July 29, 2002, Mr. Felton filed a Motion For Post–Verdict Communication With the Jurors. At that point, counsel from Mr. Felton did not yet know about Juror A's remarks. The motion could not have been more general, or more speculative. The motion sought to interview jurors because unnamed jurors had told an unnamed journalist after the trial that they knew that Leo Felton was biracial, which was not part of the trial evidence but had been mentioned multiple times in pre-trial publicity. I concluded, for reasons described below, that Mr. Felton's motion did not raise any issues that could justify recalling jurors for post-trial voir dire.

However, concerned about Juror A's comment, I described the incident in a sealed letter to the parties dated July 31, 2002. I invited sealed responses and proposals for any action the law required the Court to take.

Subsequently, I also received a letter dated September 3, 2002, from one of the alternate jurors, who complained that: 1) jurors had occasionally discussed the evidence during the course of the trial, con-

trary to the Court's express instructions; 2) one member of the jury claimed several times to be still under the influence of alcohol after a night of revelry and boasted of various personal deceitful activities; and 3) that the evidence of conspiracy was weak. I filed this letter under seal for the parties to review, although I ultimately concluded, for reasons also described below, that it did not warrant follow-up.

### D. The Interviews of Jurors A and B

After considering the parties' submissions regarding the jury's possible exposure to extrinsic information of Mr. Felton's criminal history, however, I decided to interview Juror A pursuant to Fed. R.Evid. 606(b). I issued a subpoena to require Juror A's presence in a sealed proceeding before the parties on September 17, 2002.

At the commencement of the proceeding, I placed Juror A under oath. I informed [him/her] that we did not want to hear about the jury's thought processes but rather simply needed to inquire whether jurors may have been exposed to extraneous information. When asked specifically about the source of information regarding Mr. Felton's prior attempted murder conviction, Juror A testified to hearing it either from one of the other jurors (clearly Juror B, based on the description) or possibly from a co-worker. Juror A further testified that the jury had discussed the topic in reviewing an exhibit consisting of a comic strip that Mr. Felton had drawn which depicted a brutal assault with a crowbar. Juror A reaffirmed [his/her] pretrial voir dire testimony that [he/she] did not know anything about the case before the trial began.

After considering further submissions by the parties, I subpoenaed Juror B to be interviewed on September 25, 2002. Juror B had indicated in [his/her] jury questionnaire and voir dire that [he/she] did have some prior knowledge of the case. However, at the September 25 hearing Juror B was certain that [he/she] did not know before the trial why Mr. Felton had been incarcerated previously, only that he had been incarcerated. Rather, Juror B testified credibly and with certainty, that he/she inferred that Mr. Felton had been in prison for attempted murder based on the images in the same comic strip to which Juror A referred. Juror B inferred—reasonably—that the comic strip was autobiographical. Juror B further stated that none of the jurors indicated that they had information about the nature of Mr. Felton's prior convictions from any extrinsic source.

After reviewing carefully both jurors' testimony and the parties' submissions, and for reasons described more fully below, I concluded that no further inquiry was necessary and scheduled the defendants for sentencing.

### III. LEGAL ANALYSIS

As a general rule, post-verdict interviews of jurors are forbidden except in "extraordinary situations." *United States v. Kepreos*, 759 F.2d 961, 967 (1st Cir. 1985). And should such an inquiry meet the test, it must be conducted consistent with Fed.R.Evid. 606(b), which provides that upon "an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions."

There are two kinds of situations which may trigger an inquiry of a jury after it has been selected. *See* Gertner & Mizner, *The Law of Juries*, 7–3 (1997). In the first category is "late disclosed information which would have been relevant to the jury

selection process," such as the juror's exposure to pretrial publicity. *Id.* at 7–3, 7–4. The second category, concerns influences which are "extrinsic to the deliberative process" like exposure to suppressed evidence, or influences which are "intrinsic to the deliberative process," like racist comments. *Id.*

Juror A's comments to the Court raised concerns in both categories—whether he/she had been candid with the Court when he/she indicated that he/she had not been exposed to pre-trial publicity, and whether he/she had learned a fact about the defendant's criminal record from sources outside of the trial, such as from a co worker, or from reading the press coverage.

### 1. *Original Grounds for Defendant's Motion*

Mr. Felton's original motion sought open-ended questioning of all jurors on a host of topics and their effect, if any, on deliberations. Counsel sought to question the jurors generally post-verdict about pre-trial publicity, extrinsic information, the impact of the terrorist attacks on September 11, 2001, Mr. Felton's decision not to testify, and the antagonistic defenses raised by Mr. Felton's co-defendant, Erica Chase. In the absence of any specific, credible indication that the jury had been contaminated improperly by extrinsic information or influences, or any other ground, however, I could not authorize an open-ended fishing expedition.

 There is no merit to counsel's suggestion that jurors "must have" been exposed to extrinsic information during trial simply because some unspecified number of them allegedly told an unnamed journalist after trial that they were aware of Mr. Felton's biracial background, which was not in evidence. After all, five out of twelve jurors and three out of four alternates stated during voir dire that they were aware of some publicity about the case, including publicity about Mr. Felton's ethnicity. Counsel was given free rein to inquire into the information the potential jurors may have gleaned. Counsel did not. Indeed, counsel neither challenged these jurors for cause nor removed them by peremptory challenge. It is thus entirely plausible to conclude that jurors who admitted to reading about the case also knew that the defendant was biracial before the trial started.[2]

Likewise, Mr. Felton's attempt to resurrect inquiry on other issues—*e.g.*, press coverage in general, notions of "terrorism" after September 11—is unavailing in the absence of a specific allegation of impropriety. If defense counsel failed during a week-long attorney-conducted voir dire to ferret out jurors' views on these and other issues she now raises, that is attributable to counsel's decisions at the time and not to any error or failure in the proceedings. *See Dall v. Coffin,* 970 F.2d 964, 969–70 (1st Cir.1992) ("Jurors cannot be faulted for failing to disclose information for which they were never asked."); *United States v. Rhodes,* 556 F.2d 599, 600–01 (1st Cir. 1977) (explaining that jurors can be held responsible only for questions actually

---

**2.** In any event, even if the jurors did learn of Mr. Felton's biracial background from extrinsic sources during the trial, it is hard to imagine how that knowledge would be relevant, much less prejudicial. *See Bibbins v. Dalsheim,* 21 F.3d 13, 16 (2d Cir.1994) ("The touchstone ... is thus not the mere fact of infiltration of some molecules of extra-record matter ... but the nature of what has been infiltrated and the probability of prejudice.") (internal citation omitted). If anything, knowledge of Mr. Felton's biracial would have undercut the government's theory that defendants engaged in their criminal activities to foster a race war.

asked in voir dire, not those they should have been asked).[3]

### 2. *The Alternate Juror's Letter*

■ Likewise, the letter from an alternate juror dated September 3, 2002, while troubling, was not enough to justify further inquiry. The alternate juror raised several issues, *e.g.,* premature deliberations and alcohol consumption, all of which concern intra-jury affairs of a character that does not justify post-trial investigation under Rule 606(b) and relevant case law. *See, e.g., Tanner v. United States,* 483 U.S. 107, 122–23, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987) (barring questioning of jurors regarding juror's alcohol consumption during trial because substance abuse is not "outside influence"); *United States v. Logan,* 250 F.3d 350, 381 (6th Cir.2001) (barring inquiry into allegation of premature deliberations); *United States v. Boylan,* 898 F.2d 230, 262 (1st Cir.1990) (referring to mid-trial deliberations as mere "buzznacking").

### 3. *Defendant's Previous Conviction for Attempted Murder*

■ Juror A's comments, however, raised serious concerns on a number of fronts: Because Juror A had stated during voir dire that [he/she] had no prior knowledge of the case, and because the nature of Mr. Felton's prior conviction was not in evidence, Juror A's post-trial knowledge warranted an inference either that [he/she] lied during voir dire or that the information came from an extrinsic source during the proceedings; in either case, the court would be obliged to investigate. More-

over, information about defendant's record was exactly the kind of potentially prejudicial information that Fed.R.Evid. 404 was designed exclude, to avoid any risk that a defendant's prior acts of violence might be used to suggest that he was prone to commit the violent crime charged.

Given the substantial concerns of Rule 606(b), the post-verdict inquiry of the jurors had to be conducted with care to effectuate its specific goals: "ascertaining whether misconduct actually occurred, and if so, whether it was prejudicial." *Boylan,* 898 F.2d at 258. The scope of the inquiry "should be limited to only what is absolutely necessary to determine the facts with precision." *Id.* (internal citation omitted).

I began at the "source" by interviewing Juror A. Juror A confirmed [his/her] voir dire statements that [he/she] did not have prior knowledge of the case, but [his/her] testimony as to the source of the attempted murder information was ambiguous. Juror A stated that [he/she] might have learned it from a co-worker during the trial, which would give substantial cause for concern, or from another juror during deliberations—Juror B—which could also give cause for concern, depending on the ultimate source of that juror's information.

I continued the inquiry with an interview of Juror B. Juror B acknowledged that he had spoken with Juror A on the subject of the crime for which Mr. Felton had been imprisoned. But he testified under oath, credibly and with certainty, that the conversation derived from an educated guess based on an inference from the evidence, specifically, the comic strip that Mr.

---

**3.** Nor is there any basis for the allegation that the jurors held Mr. Felton's decision not to testify against him. The Court's instruction on the subject could not have been clearer or stronger. Finally, counsel's claim that the jury was prejudiced because of the antagonistic defense strategy of co-defendant Erica Chase is disingenuous. On several occasions before trial began, counsel was asked if she was moving to sever the trials, even when it was clear that Chase's strategy and Felton's were different. She chose not to move to sever. The issue has been waived.

Felton drew while in prison depicting a violent assault with a crowbar. In my judgment, after this testimony, there was no need for further inquiry. It was clear that the information did not come from any improper extrinsic source.

Furthermore, even if Juror A improperly obtained the information from a coworker, it is not at all clear that there would be a basis for a mistrial, although First Circuit law on the subject is less than clear. On one hand, the Court has suggested that a "jury's exposure during its deliberations to *extrinsic information, whatever its source,* is an error of constitutional proportions that is grounds for setting aside the verdict, unless the exposure was harmless . . . ." *United States v. Santana,* 175 F.3d 57, 65 (1st Cir.1999) (emphasis added) (reversing conviction where judge improperly allowed jury to view defendant's exposed ears during deliberations). Indeed, the Court goes so far as to suggest that "the jury's consideration of extrinsic information raises a *presumption of prejudice,*" as to which the government bears a substantial burden—"showing beyond a reasonable doubt that the extrinsic information did not contribute to the conviction." *Id.* at 66 (emphasis added); *see also Lacy v. Gardino,* 791 F.2d 980, 983 (1st Cir.1986) (Bownes, J.) (upholding denial of habeas petition and noting that while "[j]ury exposure to facts not admitted during trial violates the sixth amendment right to trial by jury," in this case a juror's unmasking of a redacted indictment was harmless). In other decisions, the Court has strongly resisted any presumption of prejudice. *See, e.g. United States v. Bradshaw,* 281 F.3d 278, 287–88 (1st Cir.2002) (rejecting presumption of prejudice where jury was accidentally given prior version of indictment containing severed counts); *Boylan,* 898 F.2d at 261 (rejecting presumption of prejudice where jurors viewed magazine article about lawyers in

case and noting that presumption "should be limited to cases of significant ex parte contacts with sitting jurors or those involving aggravated circumstances far beyond what was shown here").

■ Here, regardless of whether or not I were to begin the analysis with a presumption of prejudice, any impropriety would have been harmless. *See Id.* at 262 (noting that even if a presumption of prejudice had come into play, it would be overcome by the trial court's finding that the incident was harmless). The "distance" between the alleged improper information, that Mr. Felton had been imprisoned for attempted murder, and the information that was already in the record about Mr. Felton's past and the apparently autobiographical comic strip, was so narrow that it could not have been prejudicial, especially given the evidence of guilt.

## IV. *CONCLUSION*

No one—least of all the courts—should underestimate the difficulty of conducting a criminal jury trial in a world of "24/7" news coverage. "It is a world that raises ever new problems reconciling the First Amendment's guarantee of a free and unfettered press, and the Sixth Amendment's guarantee of a fair trial. And it provides new assaults on the jury as an institution, able to deliberate in secret and accountable to no one." Gertner & Mizner, *supra,* 10–3.

The Court is obliged to use all of the devices at its disposal to select a jury free from publicity's taint, and to be vigilant to make certain that it remains so. It is for that reason that a single comment by a juror that suggested exposure to publicity or other extrinsic information—even if volunteered in private, when the Court thanked the juror's for their service—was

enough to trigger an inquiry. And after conducting that inquiry, I have satisfied myself that the verdict is unassailable on these grounds.

For the foregoing reasons, **I GRANTED IN PART AND DENIED IN PART** Mr. Felton's Motion For Post–Verdict Communication With the Jurors [document # 176].

**SO ORDERED.**

### *ORDER RE: MOTION BY DEFENDANT LEO FELTON FOR POST– VERDICT COMMUNICATION WITH THE JURORS*

For the reasons set forth in the accompanying Memorandum and Order of the same date, Mr. Felton's Motion for Post–Verdict Communication With the Jurors [document # 176] was **GRANTED IN PART AND DENIED IN PART**

**SO ORDERED.**