**Not for Publication in West's Federal Reporter**
**Citation Limited Pursuant to 1st Cir. Loc. R. 32.3**

# United States Court of Appeals
## For the First Circuit

No. 02-1391

UNITED STATES OF AMERICA,

Appellee,

v.

SEAN AHERN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

Before

Lynch, Circuit Judge,

Coffin and Porfilio,[*] Senior Circuit Judges.

Robert D. Dimler on the brief for appellant.
Donald A. Feith, Assistant United States Attorney, with whom
Thomas P. Colantuono, United States Attorney, was on the brief for
the United States.

July 10, 2003

---

[*]Of the Tenth Circuit, sitting by designation.

**PORFILIO**, <u>**Senior Circuit Judge**</u>.  Sean Ahern appeals his conviction for the armed robbery of the Bank of New Hampshire in Dover, New Hampshire, for which the court imposed a sentence of 294 months.  Principally challenging the sufficiency of the evidence supporting the jury's verdict, Ahern also contends objectionable words from a taped telephone conversation were improperly admitted into evidence, unfairly prejudicing his defense.  Appended to these issues are six additional claims for which he seeks plain error review.  We affirm the conviction.

When viewed in the light most favorable to the government, <u>United States</u> v. <u>Collazo-Aponte</u>, 216 F.3d 163, 191 (1st Cir. 2000), the evidence of the robbery unfolds in two stages.  In the first, on June 9, 2000, Kyle Price drove to the Cabot Street Market in Portsmouth, New Hampshire, leaving his black 1993 Honda Civic running while he dashed into the store.  When he emerged, Price saw his car vanishing down the street and noticed the man and woman who previously had been standing by a pay station were gone.

In the second, on the next morning, a man robbed the Bank of New Hampshire on Central Avenue in Dover.  Bank surveillance cameras recorded the perpetrator standing at Brenda Bailey's teller counter.  The man, a medium-build, white male, wore gloves, a dark knit cap, and black ski mask which was askew, exposing a dark mark on the side of his neck.  He held a small, black handgun and brown paper bag.  Demanding only $50 and $100 bills from both Ms. Bailey

-2-

and Julie Hensen in the next teller window, the robber drove off in a small black car with over $15,000.

A few blocks away from the bank, Alan Bandouveres, the owner of Janeto's Market, noticed a small black car parked behind the store early that morning. He later discovered the car was still there, left running with the driver's window down. Near Janeto's, a bystander saw a young man, clutching a paper bag to his chest, run from behind the market and jump into a red Jeep that had pulled up. Dover police found the Honda Civic in Janeto's parking lot. Two fingerprints, pointed downward on the driver's side door, matched Ahern's.

The government textured these scenes with the testimony of bank employees and tellers; bystanders at the bank and market; the Honda owner; store clerks where Ahern later bought merchandise with cash; two cell mates at the correctional facility where Ahern awaited trial; police officers and the FBI agent who investigated the robbery; and, most damning, Jennifer Wilson, Ahern's girlfriend.

Wilson, who testified before the grand jury after Ahern's first trial was continued, described a three-year relationship in which the two regularly used heroin, which Ahern got from his drug supplier, James Davis. When Ahern's heroin debt to Davis peaked, Wilson explained Ahern then bought his drugs from sources in Lawrence, Massachusetts. According to Wilson, while calling from

a pay phone at the Cabot Street Market to arrange the purchase, Ahern abruptly hung up, hopped into a car left idling, and drove off. Wilson testified she was "stunned." Later, she stated, Ahern arrived at her apartment with enough heroin to satisfy her daily 20-bag habit.

The following afternoon, her testimony continued, Ahern met her at a friend's apartment in Portsmouth, greeting her with flowers and a ring. Eventually, other friends provided Ahern a beat-up green truck, and the pair drove to a motel in Lawrence. En route, Ahern stopped to buy a newspaper. Wilson testified Ahern asked her if she saw the front page story about a bank robbery. When she asked if he did it, Ahern grinned, Wilson disclosed, and told her he gave the money to Davis. Wilson described their two days in Lawrence, getting high and paying for meals and the hotel with cash.

On their return to Portsmouth, Wilson testified Ahern detoured into an apartment area where he said he had to get rid of something. Ahern then showed her a flat black gun and told her he wanted to hide it somewhere. When that area proved unsatisfactory, Ahern drove to a McDonald's where, he later said, he hid the gun behind a ceiling tile in the men's bathroom.

The pair continued to the Portsmouth District Court where Ahern got out for an appointment with his probation officer. Before leaving, Ahern handed Wilson shopping bags and a "wad of

money," more than she had ever seen him carry. Within an hour, Portsmouth police summoned Wilson for questioning.

Wilson testified Special Agent Laura Hanlon interrogated her, and, although she cooperated, she admitted lying initially, frightened by the combination of her drug history, the robbery, and gun. She acknowledged her grand jury testimony was offered shortly after she was released from serving a jail sentence related to her hospitalization for a heroin overdose during the Lawrence weekend.

## I. Sufficiency of the Evidence

Ahern contends "the stack of unreasonable, insupportable, and/or overly speculative inferences from the circumstantial evidence" is insufficient to sustain his conviction. In particular, he underscores that Wilson, the only eyewitness to testify about his stealing the Honda, never explicitly stated he admitted robbing the bank, and was a drug addict who lied to investigators. Similarly deconstructing each witness's testimony to reveal the absence of a direct link to his involvement or its divergence from other evidence, Ahern maintains the sum of the forensic and testimonial evidence falls short.

We disagree. Although the government must establish each element of 18 U.S.C. § 2113(a)[1] and 18 U.S.C. § 924(c)[2] under which

_____

[1]18 U.S.C. § 2113(a) provides:
    Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another, or obtains

(continued...)

-5-

Ahern was charged, in doing so, it need not dispel "every hypothesis consistent with the defendant's innocence." United States v. Spinney, 65 F.3d 231, 234 (1st Cir. 1995)(citation omitted). Moreover, given the nature of proof in the criminal law, the use of indirect, circumstantial evidence, woven together in "[c]hains of inference," is permissible and commonplace. Id. (citing United States v. O'Brien, 14 F.3d 703, 706 (1st Cir. 1994)). Whatever inferences arise from conflicting testimony then

---

[1](...continued)
        or attempts to obtain by extortion any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association; or ...
        Shall be fined under this title or imprisoned not more than twenty years.

[2]18 U.S.C. § 924(c)(1)(A) states:
        Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime-
                ...
            (ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years.

fall to the jury, which alone assesses witness credibility. O'Brien, 14 F.3d at 707.

True, no witness positively identified Ahern as the ski-masked man holding a gun pointed at the teller or driving off in a small black car whose licence plate was one-digit off that on the stolen black Honda. However, as set forth above, several witnesses provided descriptions and details of the robber, weapon, and sequence of events, which, taken as a whole, point plausibly and rationally to Ahern's guilt. Our task, then, as a reviewing court is not to decide if that same evidence could bear a different interpretation. Instead, after carefully plumbing the record, we must ascertain whether the jury's interpretation of the evidence is both rational and supported. On this basis, we cannot say no rational jury could have convicted Ahern. United States v. Julien, 318 F.3d 316, 322 (1st Cir. 2003).

## II. Use of Taped Conversation

Ahern contends the court abused its discretion in admitting over his vigorous objection a taped telephone conversation between David Prevost, an inmate at Concord Men's Prison, and James Davis, his heroin supplier.[3] Although the government offered the tape for

---

[3]The taped conversation, a rambling, though guarded banter between Prevost and Davis, is interrupted twice:
Prevost: "Oh, sounds like you're chomping."
Davis: "Counting."
Prevost laughed and, a few minutes later, in mid-sentence, declared:

(continued...)

the jury to hear the background sound of money being counted to buttress Wilson's testimony Ahern gave Davis the stolen money to pay his debt, Ahern maintains the obvious prejudicial effect of objectionable words that were not redacted "deprived [him] of his right to a trial free from the damaging taint of inadmissible evidence." Ahern contends because his lawyer could not cross-examine Prevost, the words were left hanging, unfairly prejudicing his defense.

The government counters with the hypothesis that the words on the tape were never admitted into evidence. Instead, the tapes were offered only for the clearly audible noise of riffling bills (presumably similar to the sound of shuffling a deck of cards) in the background of the conversation.[4] Further, it maintains the court instructed the jury specifically not to consider the words but only to listen to the sounds, and the jury never saw a transcript of the tape. Because jurors are presumed to follow instructions, United States v. Lee, 317 F.3d 26, 35 (1st Cir. 2003), the government contends the court properly admitted the evidence after applying Fed. R. Evid. 403.

---

[3](...continued)
"Jesus you're peeling off something. (Noise in the background.)."
Davis: "Um,"
Prevost: (laughing) "You're working something (Laughs)."

[4]The government also questioned FBI Special Agent Hanlon about the sound of counting money for the jury to compare the courtroom demonstration with the tape.

Although we usually presume that a jury will follow the trial judge's specific, "curative instructions" in a criminal case, United States v. Bradshaw, 281 F.3d 278, 285 (1st Cir. 2002) (citations omitted), we remain skeptical of the jury's acuity in ignoring the spontaneous statements against the basso continuo of shuffling money. Surely, given the abundance of evidence connecting the dots to Ahern, the tape appears incidental and cumulative, at best.

Under the circumstances our review remains limited. "Whether or not a jury can be expected, under proper instructions, to disregard particular evidence is a judgment call, and one as to which appellate courts typically cede a high degree of deference to the trial court." Id. at 284 (citations omitted). With that reflection in mind, we believe the trial court did not abuse its discretion under Rule 403 in permitting the jury to hear the evidence.

### III. Issues of Plain Error

Quoting United States v. Lopez-Pena, 912 F.2d 1542, 1546 (1st Cir. 1989), Ahern contends five issues[5] merit plain error review, each one "so shocking that [it] seriously affect[ed] the fundamental fairness and basic integrity of the proceedings conducted below." He maintains the errors, separately and

---

[5]Because a sixth alleged plain error, whether Ahern's mother was excluded from the courtroom during voir dire, is not factually developed for this appeal, we do not address it.

cumulatively, result in a miscarriage of justice. Ahern acknowledges his burden: "to establish that the error was 'clear,' in the sense that it was 'obvious,' that it affected 'substantial rights,' and that failure to vacate [the conviction] would result in a 'miscarriage of justice.'" United States v. Crochiere, 129 F.3d 233, 237 (1st Cir. 1997)(citations omitted)(internal quotations omitted).

### A. Display of Teeth and Hands

Ahern deems "clear" and "obvious" the error in the government's calling him to display his teeth and hands to the jury after the last witness testified. The demonstration, he maintains, while appropriate when a witness has just testified about a particular fact, was improper because it occurred after the particular witnesses were questioned and could not be cross-examined.

Earlier in the government's case, Ms. Bailey, the bank teller, and Ms. Aimee Wilson, a bank employee, described Ahern in their testimony, the former stating the robber's bottom teeth were crooked; the latter, observing that he left the bank wearing tight gloves. Although defense counsel could have more readily cross-examined these witnesses had Ahern been asked to stand before the jury right after their direct examination, he was not foreclosed from recalling the witnesses to question them about their descriptions of the robber.

We have acknowledged that asking the defendant to display his teeth and hands during the trial is permissible. United States v. Santana, 175 F.3d 57, 64 n.6 (1st Cir. 1999) (citing Holt v. United States, 218 U.S. 245, 252 (1910)). The government's timing, standing alone, does not make this plain error.[6] Thus, we fail to grasp how Ahern's later demonstration seriously affected his substantial rights.

## B. Superceding Indictment

Ahern raises another timing issue, contending the government punished him for "derailing" his first trial after the jury was sworn by filing a superceding indictment and adding the § 924(c) charge. He maintains the government had evidence of the use of a gun in the robbery from surveillance tapes, testimony of bank personnel, and, as early as February 2001, Jennifer Wilson. Nonetheless, the government filed only the single charge under 18 U.S.C. § 2113(a). Because he exercised his constitutional right to retain new counsel of his choice, necessitating a continuance of his first trial date, he contends the government's filing the additional charge is the result of a vindictive prosecution. He asserts the facts will show actual vindictiveness or a sufficient likelihood of vindictiveness.

---

[6]In contrast, in United States v. Santana, 175 F.3d 57, 67 (1st Cir. 1999), defendant was asked to show his ears in response to a jury question after the jury began its deliberations. Under those circumstances, we held the error was not harmless, vacated the conviction, and remanded for a new trial.

The government counters that only after Wilson was released from Strafford County Jail and agreed to testify before the August 2001 grand jury was its proof sufficiently strengthened to charge Ahern with violation of 18 U.S.C. § 924(c). Wilson's cooperation, it states, provided new and corroborating evidence on which to base the superceding charge.[7]

Despite Ahern's characterization, prosecutorial vindictiveness is not a necessary inference on this record. Ahern's attempt to align the circumstances to show a presumption of vindictiveness is rebutted by the government's presenting sufficient reasons for bringing the second charge. United States v. Lanoue, 137 F.3d 656, 665 (1st Cir. 1998). That explanation is both "plausible and unimpeached." United States v. Stokes, 124 F.3d 39, 45 (1st Cir. 1997). Plain error does not attach.

### C. Three Evidentiary Issues

First, Ahern contends it was plain error for the trial court to permit Wilson, who had drug charges pending against her in New Hampshire, to testify when her court-appointed attorney was unable to be present to instruct her on invoking her Fifth Amendment privilege. The error, he asserts, infringed his right to a fair trial free from improper judicial interference.

---

[7]When she testified before the grand jury in August 2001, Wilson stated she previously did not tell investigators about the money and her conversation with Ahern while driving to Lawrence. She also provided descriptions of the gun and its apparent disposal by Ahern.

-12-

The government explains it informed the trial court about the absence of Wilson's attorney, and the court asked her if she would invoke the privilege. Wilson stated she wanted to testify. Although Ahern failed to specify the precise harm he suffered,[8] the government suggests the impact on its case had Wilson not testified remains speculative.

Under the plain error rubric, Ahern's conclusory allegations of judicial interference violating his due process rights ring hollow. The trial court inquired in a hearing to assure Wilson chose to proceed.

Second, Ahern contends the government's inclusion of facts not in evidence in its closing argument – whether the stolen Honda was driven towards downtown Portsmouth, the owner's version, or, in the opposite direction, Wilson's testimony – was a "deliberate attempt to mischaracterize the facts" and bolster Wilson's testimony. Despite his trial counsel's failure to object or request a limiting instruction, he insists this prosecutorial misconduct amounts to plain error.

The jury heard each version of the Honda's disappearance, and, in essence, decided which one it believed. United States v. Lopez-Lopez, 282 F.3d 1, 17 n.9 (1st Cir. 2002). Again, Ahern's contention falls short of establishing a plain error.

---

[8]Indeed, the need to protect Wilson's Fifth Amendment right as a rudiment of Ahern's Due Process right stands unexplained.

Third, Ahern claims the government's introduction of a $100 bill found in a dresser in James Ryan's vacated apartment violated his Fourth Amendment rights.  Ahern maintains his privacy rights arise from his status as Ryan's "de facto roommate," in which he could come and go to the apartment under "an open agreement with Ryan to use a window for entry."  Although he concedes Ryan moved out of the apartment, he argues that his abandonment does not trigger "consent to a search into the former tenant's personal effects."  Thus, having established his standing to raise a Fourth Amendment challenge, he urges the admission into evidence of the $100 bill was plain error.

After previously visiting Ryan's apartment, Detective Thomas Stinglen returned and with permission from a maintenance worker entered the apartment.  Although no one was living there, some furniture was left behind.  In one of the drawers he opened, he found the $100 bill.

Not only does Ahern lack a privacy interest in the abandoned property, United States v. Kelly, 329 F.3d 624 (8th Cir. 2003), but also he cannot bootstrap any expectation of privacy to an apartment rented by another who has vacated it.  See, e.g., Abel v. United States, 362 U.S. 217, 241 (1960).  His argument is fatuous.

Finally, Ahern maintains the cumulative effect of each of these errors undermines his due process and necessitates a new trial.  This "kitchen-sink contention that the cumulative effect of the

putative errors" requires us to assess whether the precise interaction of errors amounts to an unfair trial. <u>United States</u> v. <u>Villarman-Oviedo</u>, 325 F.3d 1, 18 (1st Cir. 2003).

> Of necessity, claims under the cumulative error doctrine are sui generis. A reviewing tribunal must consider each such claim against the background of the case as whole, paying particular weight to factors such as the nature and number of errors committed; their interrelationship, if any, and combined effect; how the district court dealt with the errors as they arose (including the efficacy--or lack of efficacy--of any remedial efforts); and the strength of the government's case.

<u>Id</u>. (quoting <u>United States</u> v. <u>Sepulveda</u>, 15 F.3d 1161, 1196 (1st Cir.1993)). After such review, we conclude Ahern's contention is without merit. **AFFIRMED.**