Yogi WASHINGTON, Appellant,

v.

UNITED STATES, Appellee.

No. 00–CF–613.

District of Columbia Court of Appeals.

Argued Feb. 19, 2004.

Decided Aug. 25, 2005.

Jennifer C. Daskal, Public Defender Service, with whom James Klein, Samia Fam and Tracey D. Weaver, Public Defender Service, were on the brief, for appellant.

Donnell W. Turner, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Roy W. McLeese III, and Carolyn E. Becker, Assistant United States Attorneys, were on the brief, for appellee.

Before SCHWELB, WAGNER,* and REID, Associate Judges.

REID, Associate Judge.

This case raises the question as to whether the trial court erred when it allowed the jury, during its deliberations and over defense counsel's objection, to view appellant Yogi Washington up close, and at multiple angles, where the defendant had not been similarly shown to the jury during the trial. We hold that the trial court did not err in allowing the jury, at its request, to view Mr. Washington in this manner, and that their close-up view of Mr. Washington did not constitute "new evidence" requiring the trial court to reopen the case.

## FACTUAL SUMMARY

At Mr. Washington's third jury trial,[1] the government presented evidence that at approximately 12:15 a.m., on September 9, 1998, a man wearing jeans, a "light colored shirt," a "blue hat placed over his head," and "holding [a blue sweatshirt] to cover a portion of his mouth," entered the Red Roof Inn on the 500 block of H Street, in the Northwest quadrant of the District of Columbia. The man approached the front desk attendant, Joseph Frazier, pointed a revolver "directly at [his] face," and told Mr. Frazier to "give me your money." Mr. Frazier immediately grabbed the barrel of the man's gun, and the two men wrestled for control of the weapon. During this struggle, the armed man "stumbled back[wards]" and momentarily lost

---

* Judge Wagner was Chief Judge of the court at the time this case was argued. Her status changed to Associate Judge on August 6, 2005.

1. The previous two trials each resulted in a hung jury.

control of the weapon; Mr. Frazier, meanwhile, lost his grip on the barrel of the gun. He watched as the man regained control of the gun, and then Mr. Frazier quickly ducked down behind the counter.

Officer Marchella Horton of the Metropolitan Police Department ("M.P.D."), the hotel's night security guard, was standing in the lobby of the Red Roof Inn at the time of the incident. After the brief struggle between Mr. Frazier and the armed man, Officer Horton found herself "face to face" with the assailant, her "gun ... pointed at [the assailant] and his gun ... pointed at [her]." Officer Horton told the man, "don't even try it." Suddenly, the armed man bolted; he "turned around and ran" out of the hotel lobby. He "made a left" on H Street, running parallel to the hotel, and "made a left around to the rear of the [hotel]."[2] Officer Horton, who was only "five or ten feet" away from the armed man, "chased him" out of the hotel and down H Street. Fearing that "he would shoot [her] if [she] ran around the corner" of the hotel, Officer Horton "stopped and waited [for] a few seconds before [she] looked around the corner." When she did look around the corner, she saw the armed man "stooping down behind [a] dumpster" in the alleyway. The dumpster was approximately forty to fifty feet from where the officer was standing.

Officer Horton "ran back inside [the hotel] and told Mr. Frazier to call [the police]." After only "a few seconds," she "ran back out and stopped ... at the corner again and looked around to see if [the armed man] was still there." She saw that the man was still crouching beside the dumpster, and observed him as he removed a "gray T-shirt" and "threw it on the ground." Officer Horton "waited on the corner and watched him until [her] backup arrived." Officer Michael Glean of the M.P.D. arrived on the scene in a marked police cruiser approximately three or four minutes later. Together, Officers Horton and Glean descended upon the dumpster.[3] They found Mr. Washington, covered in sweat and shirtless, "squatting down" behind the dumpster.[4]

Sergeant Robert Glover of the Metropolitan Police Department arrived on the scene as Officers Horton and Glean were placing Mr. Washington under arrest. Sergeant Glover conducted a pat down search of Mr. Washington, finding "12 live rounds of ammunition" in Mr. Washington's "left front pants pocket." The officers also searched the area surrounding the dumpster where Mr. Washington was arrested, as well as the section of the alleyway which the assailant had used to escape. The officers found the assailant's gray tee shirt, blue hat, sweatshirt, and revolver, all of which had presumably been thrown to the ground as the assailant fled the hotel. The ammunition found in the revolver was the same caliber as the ammunition recovered in Mr. Washington's pocket.

On November 25, 1998, Mr. Washington was charged in an eight-count indictment with: (1) two counts of second-degree burglary while armed (pistol), D.C.Code

---

2. Officer Horton stated that when she ran out of the hotel lobby she noticed a car, which did not have its headlights on, speed away. However, she stated that the assailant did not get in the vehicle.

3. Officer Horton ran down the alley; Officer Glean drove his cruiser down the alley next to her.

4. When Officer Glean initially placed Mr. Washington in handcuffs, he conducted a pat-down search for "any weapon, knife or gun," but he did not find anything "indicative of a weapon" on Mr. Washington's person.

§§ 22–1801(b), –3202 (1996);[5] (2) assault with intent to commit robbery while armed, D.C.Code §§ 22–503, –3202, –2901 (1996);[6] (3) assault with a dangerous weapon, D.C.Code § 22–502 (1996);[7] (4) possession of a firearm during a crime of violence ("PFCV"), D.C.Code § 22–3204(b) (1996);[8] (5) carrying a pistol without a license ("CPWL"), D.C.Code § 22–3204(a)(2) (1996);[9] (6) possession of an unregistered firearm, D.C.Code § 6–2311(a) (1981);[10] and (7) unlawful possession of ammunition, D.C.Code § 6–2361(3) (1981).[11] At his jury trial in January of 2000, the government presented physical evidence of the incident, including the firearm and clothing recovered in the alleyway, and pictures of the assailant captured by the hotel's security camera. The government also presented the testimony of Joseph Frazier, Officers Horton, Glean, and Carroll, and Sergeant Glover. Mr. Washington's defense at trial was misidentification; he presented the testimony of Michael Ehrmann, a defense investigator, and also recalled Sergeant Glover and Officer Horton.[12]

At trial, Mr. Frazier identified Mr. Washington as the armed man who entered the Red Roof Inn that evening. Mr. Frazier testified that although the assailant held a sweatshirt "around his mouth," he "could still see the upper portion of [the man's] face." During the "approximately twelve seconds" that the incident lasted, Mr. Frazier stated that he was "mostly focused on [the man's] face," and that he was "very confident that [Mr. Washington] [was] the man that pulled the gun [on him]." On cross-examination, Mr. Frazier admitted, however, that the arresting police officers did not ask him to identify Mr. Washington as the assailant at the time Mr. Washington was arrested, or any time prior to trial.

Officer Horton also identified Mr. Washington as the assailant. Officer Horton testified that when she was "face to face" with Mr. Washington in the hotel lobby, with her gun drawn, he was holding his revolver with both hands, and that he did not "have his hands up" covering his face anymore. She was confident that Mr. Washington, the man found hiding behind the dumpster, was the same man whom she had only minutes earlier chased from the hotel, noting that he was wearing "the same gray shirt [as the man] that ran out the door." On cross-examination, however, Officer Horton admitted that she lost sight of the assailant when "he turned the corner" of the alleyway, and that she never actually saw Mr. Washington run the length of the alleyway to the dumpster; rather, when she eventually turned the corner, she saw Mr. Washington taking off his shirt behind the dumpster. She also admitted that she never saw the assailant throw the gun, hat, or sweatshirt to the

5. Recodified at D.C.Code §§ 22–801(b), –4502 (2001).

6. Recodified at D.C.Code §§ 22–403, –4502, –2801 (2001).

7. Recodified at D.C.Code § 22–402 (2001).

8. Recodified at D.C.Code § 22–4504(b) (2001).

9. Recodified at D.C.Code § 22–4504(a)(2) (2001).

10. Recodified at D.C.Code § 7–2502.01(a) (2001).

11. Recodified at D.C.Code § 7–2506.01(3) (2002).

12. The defense investigator testified that the distance between H Street and the "retaining wall," which was located near the dumpster where Mr. Washington was found, was 113 feet. However, he admitted that the dumpster was no longer in the same location as it was on the night of the incident.

ground; that she could not remember the assailant's height, weight, or facial features; and that she was "focusing" on the man's revolver, not his face, during the incident.

The jury was excused to begin its deliberations on January 13, 2000. The following day, the trial court advised the parties that it had received a note from the jury requesting that it be allowed "to view the defendant at close range, like two to three feet and from each side." Defense counsel objected to the proposal, claiming that "the request constitute[d] new evidence," and that it amounted to "an in-court demonstration of Mr. Washington which was not introduced at ... trial." Defense counsel argued that while Mr. Washington may have been visible to the jury by his mere presence in the courtroom, he was not "an exhibit" which the jury was free to inspect. Defense counsel concluded that it would be "extremely prejudicial" for the trial court to essentially allow the jury to perform its own post-trial "investigation."

After carefully considering defense counsel's arguments, and noting that the "sole issue" was "whether [it could] ... permit the jury to be somewhat closer to Mr. Washington during jury deliberations," the trial court concluded that it would grant the jury's request to see Mr. Washington "at close range." It reasoned that Mr. Washington's "face [was] already in evidence" because he had been identified by several government witnesses, and because the government had introduced photographs from the hotel security camera which showed the face of the assailant.[13] Moreover, the trial court noted that

"in essence" the jury was not requesting anything which it had "not already had an opportunity to see during the course of the trial." It continued:

> The defendant has been an object of evidence, if you will, in the trial. No defendant can ever have a sticker and be moved into evidence. This defendant has been here throughout the trial. The jury has had the opportunity to see him standing, to see him sitting, to see him consult with counsel, to see him move his head, to see different sides of his face. They have had ample opportunity to see him. And the only question becomes can they see him closer up.

Given that all of the jurors were "in a position to see [Mr. Washington]," and that "some jurors may have better eyesight than others," it concluded that the jury's request would "level the playing field" between those jurors "who do not have as good eyesight as those [who do]."[14]

The trial court then "ask[ed] Mr. Washington ... to position himself in front of the jury box." Standing "less than a foot away" from the jury box, with his left profile facing the jury, Mr. Washington slowly walked from one end of the jury to the other, pausing briefly several times to give the jury an opportunity to look at the profile of his face. He then turned around and, with his right profile facing the jury, walked back to where he was originally standing, again pausing at times to give the jury an opportunity to see his profile. The trial court then had Mr. Washington stand "almost in the center of the well of

---

13. The trial court observed, however, that the photographs were of such poor quality that the jury would be unable to use them to identify Mr. Washington as the assailant. The photographs provided no distinguishing features beyond the assailant's facial hair, which the jury could see from where it was seated.

14. The trial court relied on *United States v. Rincon*, 28 F.3d 921 (9th Cir.1994), to support its conclusion.

the courtroom," and "look towards his left." The trial court noted that "Mr. Washington was never eyeball to eyeball with any of the jurors," and that he walked "in a dignified fashion . . . in front of the jury."[15] The jury was then excused to continue its deliberation.

Only a few hours after the demonstration, the jury sent another note to the trial court indicating that it was "unable to reach a decision," and asking the trial court to "declare a hung jury." The trial court excused the jury for the weekend and instructed the jurors to return the following week to resume their deliberations. The jury resumed deliberating on Tuesday morning, taking a break between 12:15 and 1:30 p.m. At approximately 3:08 p.m., the trial court advised the parties that the jury had a reached a verdict—guilty on all charges, except for one count of second-degree burglary while armed.[16]

## ANALYSIS

■ Mr. Washington's sole contention on appeal is that the trial court committed reversible error when it allowed the jury to view him "up close and from multiple angles" during its deliberations. He claims that his mere presence in the courtroom during the trial did not "place him in evidence" or permit the trial court "to present him before the jury as a demonstrative exhibit." He argues that this "highly prejudicial error" was compounded by the trial court's refusal to give Mr. Washington "an opportunity to address the new evidence through cross-examination, additional evidence, or argument."

The government contends that "the trial court did not abuse its discretion" by allowing the jury to have a closer inspection of Mr. Washington. It argues that "the physical appearance of the defendant in the courtroom is properly treated as evidence, without any requirement that the defendant [be] formally admitted into evidence," and that the jury may freely re-examine evidence of Mr. Washington's appearance during its deliberations, including a "closer inspection" of Mr. Washington himself.

The question raised by Mr. Washington is whether the jury may, during its deliberations and over defense counsel's objection, be allowed to examine his facial profile up close, and at multiple angles, even though he did not testify at trial and was not shown to the jury in a similar fashion during the trial; in other words, whether Mr. Washington's facial characteristics constitute "new evidence" requiring the trial court to reopen the trial. This is an issue of first impression for the court. We

---

**15.** Defense counsel provided a description of the display for the record:

> I think the way it can be described in the record is that Mr. Washington walked starting from the left, the rail site closest to Your Honor, walked about less than a foot away from the rail, and that he walked from that rail to the other end of the rail in a straight line when he was showing the profile as his profile. . . . And at some point Mr. Washington stepped back and stood almost in the center of the well of the courtroom and then was asked to move closer where he moved back in a straight line. And he stood a foot and a half to two feet away from the rail [of the jury box], and then at

some point he was asked to look towards his left which would be looking towards seats number seven and eight in the back.

**16.** On April 10, 2000, Mr. Washington was sentenced to concurrent terms of five to fifteen years for second-degree burglary while armed, fourteen years to life for assault with intent to commit robbery while armed, and five to fifteen years, with a mandatory five-year term of imprisonment, for PFCV. In addition, Mr. Washington was sentenced to three to nine years for assault with a dangerous weapon, one year for unlawful possession of ammunition, and one year for possession of an unregistered firearm.

conclude that the jury was free to examine the facial characteristics of Mr. Washington during its deliberations, and that this demonstration did not constitute "new evidence" requiring the trial court to reopen the case.

Mr. Washington relies on *United States v. Santana*, 175 F.3d 57 (1st Cir.1999), and *Scott v. Florida*, 664 So.2d 3 (Fla.App.Ct. 1995), for the proposition that the jury's request constituted a request for "new evidence." [17] However, both of these cases are distinguishable from the facts of the present appeal in one important and, we think, controlling respect—the jury, in this case, did not ask to observe any aspect of Mr. Washington which it could not previously have viewed during his trial. Instead, the jury asked to re-examine Mr. Washington's facial profile, something which it had had the opportunity to view at various times and at various angles throughout the course of trial.

In both *Santana* and *Scott, supra,* by contrast, the juries were given the opportunity to view aspects of the defendants which had not been observable during the trial itself. For example, in *Santana,* the jury requested, after the close of evidence and during its deliberations, to return to the courtroom to observe the defendant's ears, which had been covered during the trial by headphones the defendant was wearing to hear translations. 175 F.3d at 60. Over defense counsel's objection, the trial court allowed the jury to enter the court room and "observe[ ] Santana without his headphones for about thirty seconds." *Id.* at 63. On appeal, the First

Circuit held that the trial court had erred by allowing the jury to consider "information extrinsic to the closed record." *Id.* at 64. The court reasoned that "[t]he jury's request ... did not pertain to evidence that was presented during the course of the trial" because "Santana's ears had been hidden during the entire trial." *Id.* at 63.

Similarly, in *Scott,* the jury requested, after the close of evidence and during its deliberations, "to view the defendant's right profile." 664 So.2d at 4. Over defense counsel's objection, the trial court granted the jury's request, and the defendant was asked "to display his face from different angles to the jurors." *Id.* at 4. On appeal, the Intermediate Court of Appeals for the Third District of Florida reversed. The court held that the jury's request constituted an "improper" request for "new evidence" because "the jury had not viewed that profile at trial." Indeed, the *Scott* court noted that the trial court had "expressly found" that the jury "had not seen" the right side of the defendant's face at any time during the trial; therefore, it concluded that "[t]he display ... constitute[d] non-testimonial 'real or physical' evidence" which should not have been introduced after the close of evidence.

In the instant case, however, the jury did not request to view any part of Mr. Washington which it had not observed at trial. This fact was expressly highlighted by the trial court. The trial court noted that all of the jurors were "in a position to see [Mr. Washington]," stating:

**17.** Mr. Washington also relies on *Ex parte Batteaste,* 449 So.2d 798, 799 (Ala.1984), where the Supreme Court of Alabama held that it was error for the trial court to permit "the jury, over objection of the defendant, to view the defendant's face to see if he had a scar on it." In *Batteaste,* however, the jury's request, similar to the requests made in both *Santana* and *Scott, supra,* was a request to see new evidence. Specifically, the jury in *Batteaste* did not, during the course of the defendant's trial, have an opportunity to observe whether he had a facial scar on one side of his face. Thus, *Batteaste* is distinguishable from the facts of the present case.

This defendant has been here throughout the trial. The jury has had the opportunity to see him standing, to see him sitting, to see him consult with counsel, to see him move his head, to see different sides of his face. They have had ample opportunity to see him.

Thus, unlike both *Santana* and *Scott*, the jury in this case did not request to observe any part of Mr. Washington which it had not already had an opportunity to view during the course of his trial. In short, we are confident that the brief display of Mr. Washington, which was carefully choreographed by the trial court, did not exceed the bounds of what the jury had already observed.

Therefore, we hold that the jury's request to view Mr. Washington up close did not constitute a request for "new evidence." The general principle articulated in *Santana* and *Scott*, *supra*, that a jury should not view physical evidence of the defendant during its deliberations which it did not observe at trial, is sound. The demonstration that permitted the jury to see Mr. Washington again, which was conducted in a "dignified" manner, did not violate this principle. A contrary holding might well disadvantage those jurors with poor vision, especially where the sole issue at trial is the identification of the assailant, and an up close view of Mr. Washington was just as likely to exonerate him as it was to be incriminating.

In addition, we agree with the trial court that this case is analogous to *United States v. Rincon*, 28 F.3d 921 (9th Cir.1994). In *Rincon*, the trial court "allowed the jury to view [the defendant] next to a surveillance photograph [of the assailant] after jury deliberations had begun." *Id.* at 926. On appeal, the appellant argued that the "display was extrinsic evidence not introduced at trial," and that it was therefore improper for the trial court to allow the jury to observe him standing next to the photographs. The Ninth Circuit affirmed, concluding that "the display which occurred while the jury was deliberating [did] not fall within [the] definition of extrinsic evidence because all the evidence at issue, ... [including] Rincon himself, w[as] presented to the jury during the trial prior to deliberations." *Id.* at 926. Noting that the "surveillance photograph was admitted into evidence," "two witnesses made in-court identifications of Rincon," and "Rincon's sole defense consisted of displaying himself in front of the jury for identification purposes," the Ninth Circuit concluded that the post-trial display "must be considered a review of evidence presented during trial." *Id.* at 926–27.

While Mr. Washington never formally "display[ed] himself in front of the jury," *see id.*, we do not consider this to be a controlling factor. Throughout the course of the trial, the jury was free to examine Mr. Washington, including his facial characteristics and profile, and to use its observations, even though he neither testified nor intentionally displayed himself to the jury, in its deliberations. *See United States v. Pierce*, 136 F.3d 770, 775 (11th Cir.1998) ("[B]ecause the surveillance photograph was admitted into evidence, the jury was certainly able to compare [the defendant's] appearance at trial with the appearance of the individual depicted in the photograph."). *See also State v. Hawkins*, 745 A.2d 165, 168 (R.I.2000) ("Physical characteristics relevant to most eyewitness identifications (such as size, gender, skin and hair color, special deformities, and facial features) are apparent, and can be referred to in argument, without a defendant having to take the stand and subject himself to cross-examination and impeachment.") (quotation marks and citations omitted); *State v. Brown*, 38 Ohio St.3d 305, 528 N.E.2d

523, 538 (1988) ("A defendant's face and body are physical evidence."). The jury was likewise free to compare its observations of Mr. Washington to the photographs of the assailant captured by the hotel security camera. *Pierce, supra.*

By allowing the jury to examine Mr. Washington up close, the trial court did nothing more than facilitate the jury's role as factfinder. Analytically, this is similar to those circumstances where the jury is given a magnifying glass to reexamine physical evidence.[18] *See United States v. George,* 56 F.3d 1078, 1084 (9th Cir.1995) ("No 'new evidence' resulted from the jurors' use of a magnifying glass to examine the fingerprint cards and gun."); *United States v. Brewer,* 783 F.2d 841, 843 (9th Cir.1986) ("We are unable to see how the use of the magnifying glass to view photographs differs from the use of corrective eyeglasses by jurors."). As the trial court noted, the display helped "level the playing field" between those jurors "who do not have as good eyesight as those [who do]."

■■ Finally, even if we were to assume that the trial court erred by allowing the jury to examine "new evidence" without also "reopen[ing] the case to allow the introduction of the evidence and any appropriate argument," *see Barron v. United States,* 818 A.2d 987, 992 (D.C.2003), the error would be harmless. In a case of this type, we apply the "harmless error test first articulated by the Supreme Court in *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), to determine whether . . . evidence may have

been erroneously sent to and considered by the jury, but not properly admitted into evidence." *Id.* at 992. Under *Kotteakos:*

> [If] the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress. But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

*Barron,* 818 A.2d at 993 (quoting *Kotteakos, supra,* 328 U.S. at 764–65, 66 S.Ct. 1239 (internal citation omitted)). In other words, we must "determine whether the judgment was substantially swayed by the error 'without stripping the erroneous action from the whole.' " *Id.*

Here, the jury was excused to begin its deliberations on the morning of January 13, 2000. The following morning, January 14, 2000, the jury sent a note to the trial court stating that it "would like to view the defendant at close range, like two to three feet, and from each side." The jury also "indicate[d] that until [it] ha[d] an opportunity to see Mr. Washington [it][was] in a

---

**18.** This case is, however, to be distinguished from *Barron v. United States,* 818 A.2d 987 (D.C.2003), *infra,* where we reviewed the trial court's decision to "allow[ ] the jury to view [the defendant's] car during jury deliberations," even though the car had not been admitted into evidence. *Id.* at 990. In holding that "the trial court erred in allowing the [jury] view without reopening the case," *id.* at

992, we expressly found that the jury's request constituted a request for new evidence. Thus, we concluded that the trial court "had two options: (1) refuse to allow the jury view or (2) reopen the case to allow the introduction of the evidence and any appropriate argument." *Id.* Here, by contrast, we conclude that the jury's request did not constitute a request for new evidence.

stalemate." After considering defense counsel's objections, the trial court brought the jury back into the courtroom and had Mr. Washington display his right and left profiles to the jury. The jury was then excused to continue its deliberations. A few hours after the demonstration, however, the jury sent another note to the trial court indicating that it was "unable to reach a decision," and stating that it "would like to declare a hung jury." The trial court excused the jury for the weekend and instructed the jurors to return the following week to resume their deliberations. The jury resumed deliberating on Tuesday morning, and reached a guilty verdict that same afternoon.

Looking at the sequence of the jury's deliberations, we are confident, "without stripping the erroneous action from the whole," that "the judgment was not substantially swayed by the error." *Kotteakos, supra*, 328 U.S. at 765, 66 S.Ct. 1239. Only a few hours after observing Mr. Washington up close, the jury sent a note to the trial court indicating that it was "unable to reach a decision." The jury remained deadlocked. Whatever assistance the jury thought the demonstration might give it in identifying Mr. Washington as the assailant, it is clear from the record that the display did not sway the jury in either direction. Moreover, this is not surprising, given that, as even the government freely acknowledged in its closing argument, the photographs were of such poor quality that they could not be used to compare Mr. Washington to the assailant. In short, the jury's request to see Mr. Washington up close and at multiple angles was really a request to view evidence of marginal relevance to the iden-

tification issue. Without being able to compare Mr. Washington's profile to the man depicted in the photographs—the only useful purpose the display could have served—the jury could not use its post-trial observations to identify him as the assailant.

Our belief that the display "did not influence the jury, or had but very slight effect," *see Kotteakos, supra*, 328 U.S. at 764, 66 S.Ct. 1239, is reinforced by the fact that this was not a close case. The government presented two eyewitnesses, Mr. Frazier and Officer Horton, who testified that Mr. Washington entered the hotel, pointed a gun at Mr. Frazier, and attempted to rob the hotel. Both eyewitnesses identified Mr. Washington in-court as the assailant. Mr. Frazier, in particular, stated that he was "very confident that [Mr. Washington] [was] the man that pulled the gun [on him]." Moreover, Mr. Washington, who matched the physical description of the assailant provided by Officer Horton,[19] was found hiding behind the dumpster, shirtless, with a "gray T-shirt"—the same shirt which Officer Horton watched him remove—on the ground beside him. In his pants' pocket were twelve .38–caliber bullets, which matched the bullets recovered from the revolver in the alleyway. In short, there was ample evidence, both direct and circumstantial, linking Mr. Washington to the attempted robbery. This is why we are able to say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error."[20] *Kotteakos*, 328 U.S. at 765, 66 S.Ct. 1239.

---

**19.** Although Mr. Washington was not wearing the blue hat or the blue sweatshirt like Officer Horton's description of the assailant, these items were found discarded in the alleyway,

only a short distance from the dumpster where he was hiding.

**20.** Finally, in response to our concurring colleague's contention that the majority has

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*

SCHWELB, Associate Judge, concurring in the judgment.

I concur in the judgment of the court and in all of the court's opinion except the discussion of harmless error. In my view, that discussion is unnecessary, for it has no bearing on the outcome of the appeal. The result, affirmance of Washington's convictions, would be the same if the opinion ended before the first mention of harmlessness on page 583.

Each of Washington's first two trials ended in a mistrial because neither of the two juries was able to reach a unanimous verdict. The jury in the third trial, at which Washington was ultimately convicted, also stated, at one point, that it was unable to agree. Under these circumstances, I do not believe that we should opine (unnecessarily) on the issue of harmlessness. In all other respects, I am pleased to join Judge Reid's persuasive opinion.

"opine[d] (unnecessarily) on the issue of harmlessness," we note simply that this court has, in prior cases requiring us to consider harmless error, considered whether or not the alleged error was harmless even after concluding that there was no error. *See, e.g., Cowan v. United States,* 629 A.2d 496, 503–04 (D.C.1993) ("Even if [the appellant] had ade-

quately preserved as an issue the judge's failure to instruct on self-defense or defense of another—which he did not—we are satisfied that, under the unique circumstances of this case, any error would have been harmless.... We, therefore, also affirm on this alternative ground.") (Schwelb, J.).