**Eric H. EVANS, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 02–CF–1034.

District of Columbia Court of Appeals.

Argued March 17, 2004.
Decided Sept. 22, 2005.

Alexander J. Willscher, with whom Jeffrey T. Green, Washington, appointed by the court, was on the brief, for appellant.

Bernard J. Delia, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Elizabeth Trosman, Wanda Dixon, and Jelahn Stewart, Assistant United States Attorneys, were on the brief, for appellee.

Before SCHWELB and REID, Associate Judges, and KING, Senior Judge.

REID, Associate J.

Appellant Eric H. Evans was convicted of first-degree burglary, in violation of D.C.Code § 22–1801(a) (1996), recodified as D.C.Code § 22–801(a) (2001). He filed a timely notice of appeal. He challenges his conviction on the grounds that the trial court erred by (1) allowing the jury to use magnifying glasses; (2) coercing the jury's verdict against him; and (3) denying his motion for judgment of acquittal. We affirm.

## FACTUAL SUMMARY

The record before us shows that in the early morning hours of September 18, 2001, around 4:00 a.m., a loud noise awakened two people, Mary Butler and Jonathan Schneider, who were sleeping in their two-level apartment, located in a converted row house in the 1300 block of Rhode Island Avenue in the Northeast quadrant of the District of Columbia. The noise came from the upper level of the apartment. Upon hearing the noise a second time, Ms. Butler and Mr. Schneider locked themselves in the bathroom and called the police.

As Officer Kevin Griffin of the Metropolitan Police Department ("MPD") arrived at the row house, in response to a radio assignment "[f]or a burglary in progress," he saw someone in the doorway leaving with "various electronic equipment . . . in his arms." His view of the person was aided by hallway and street lighting. The person, who was about ten feet away from Officer Griffin, "looked [the officer] dead in the eye," and then "went back into the building and slammed the front door." The door locked. At Mr. Evans' trial, Officer Griffin identified the person he saw in the hallway as Mr. Evans.

Officer Griffin radioed for backup. Two officers responded, Officer Lance Kashinsky and Officer Alec James Corapinski. Officer Kashinsky accompanied Officer Griffin inside the building, and Officer Corapinski hastened to the back of the building. Once inside the building, Officer Griffin noticed a DVD player and a Game Boy in the hallway, and "a woman's purse lying on the stairs," as well as "a man's wallet" higher up the staircase. Officers Griffin and Kashinsky climbed to the roof of the building. They did not see anyone, but noticed a very close "separate building with a fire escape."

While the two officers were searching the building and the roof, Officer Corapinski heard a noise in the back of the building, which faced P Street. The noise sounded like "something contacting metal," in a "rhythmic" fashion and he "assume[d] it was feet." He noticed the fire escape. As he "got closer" he "observed [Mr. Evans whom he identified in court] run from a small alley into the sidewalk." When Mr. Evans saw Officer Corapinski, he "stopped running and turned [in] the opposite direction and started walking quickly away from [the officer]." Officer Corapinski used his radio to instruct a patrol unit to "stop the guy [who's] going to be crossing 14th Street." After Mr. Evans was

stopped, Officer Corapinski thought he "appeared very nervous." Mr. Evans "was sweating profusely." When the officer conducted a frisk of Mr. Evans, he heard "[Mr. Evans'] heart ... pounding like real heavy and he was making spontaneous utterances like someone is nervous." The "spontaneous utterances" consisted of Mr. Evans saying rapidly: "[W]hat did I do, what did I do?" Officer Corapinski used his radio to ask Officer Griffin to determine whether anyone could identify "the suspect who was ... in the building stealing the property." Officer Griffin, who had given the description of "a black male with dreads," informed Officer Corapinski that he could identify the suspect. As Officer Corapinski was speaking with Officer Griffin, Mr. Evans said repeatedly: "that's not me, that's not me, I don't have dread locks. That's not me." Officer Griffin proceeded to 14th and P, looked at the suspect and identified him as the person he had seen earlier trying to leave the building in the 1300 block of Rhode Island Avenue. Officer Griffin was "a hundred percent positive" that Mr. Evans was that person. Mr. Evans' hair "was unkempt, messy and sticking out at various angles." Mr. Evans was arrested.

Following Mr. Evans' arrest, Officer Griffin called for a crime scene investigator. Officer John Spencer, a crime scene technician, arrived on the scene and lifted fingerprints. At Mr. Evans' trial, Diane Downing, a fingerprint specialist for the MPD for "almost eight years," who had examined "hundreds of thousands" of fingerprints, testified that she inspected the prints lifted from the crime scene—one from a key chain, and the other from the front door plate. Previously, she worked as a fingerprint specialist for the Federal Bureau of Investigation for twenty-one years. She described her methodology and referenced the guideline used in the industry to determine whether a lifted or latent useable print was identical to the subject's fingerprint. The prints are deemed identical if at least eight points or characteristics are "in the same position and location," that is "the same exact place." With respect to the print lifted from the key chain, Ms. Downing "found sixteen characteristics in the same relative position and location." And, regarding the latent print lifted from the front door plate, Ms. Downing detected "nine characteristics that were in the same position and location." Hence, she concluded that the lifted, latent prints were those of Mr. Evans.

## ANALYSIS

Mr. Evans contends that "the trial court committed reversible constitutional error when it allowed the jurors to use magnifying glasses to make their own scientific assessments of whether the latent prints recovered from the crime scene matched [his]," and that he "was denied his constitutional right to a fair trial as guaranteed by the Fifth and Sixth Amendments of the United States Constitution." The government contends that the jury's use of magnifying glasses did not constitute " 'extrinsic evidence' because the fingerprints had already been placed in evidence and the magnifying glasses merely amplified that which was already there." Mr. Evans also argues that his "conviction should be reversed because the trial court coerced the verdict when, having already given an instruction to the deadlocked jury pursuant to *Winters v. United States,* 317 A.2d 530 (D.C.1974) (en banc), and subsequently being informed that the jury was still deadlocked, the trial court sent the jury back to deliberate for another full day." The government maintains that Mr. Evans did not object to the course of action followed by the trial court in addressing three deadlock notes from the jury and specifically

stated that he did not want to request a mistrial; therefore, the trial court did not commit plain error in handling the deadlock notes.

We first provide the factual context for our analysis. On Thursday, August 1, 2002, the jury sent four notes to the trial judge. The judge discussed the notes and proposed responses with counsel for the parties before addressing the jurors. The first noted stated: "What is the probability, the percentage of the fingerprints not belonging to the defendant?" The trial court told the jury: "I must say candidly to you that I am unable to answer this question. And also to say to you that you should make your decision in this case based upon the evidence that has been presented to you." The second question considered by the trial judge asked: "Is there any information on the fingerprinting process as a whole? Is there any information on the fingerprinting process that the Court can provide?" The trial court replied: "[T]he answer again is no, and you should not be researching the fingerprinting process. Again, you should make your decision in this case based upon the evidence that has been presented on the record, if you will, that is before you." The third question read: "Is there any information on the fingerprinting process that the Court can provide?" The trial court asserted: "[T]he answer is no. And again, I would say you need and you must make your decision in this case based upon the record that is before you, the evidence that is before you." The fourth question was: "Does the jury have to accept the fingerprint standard set forth by the Government?" The trial court answered, in part:

> [Y]ou heard testimony from the expert witness Diane Downing as to the guideline that she used in making her determination....

You are not bound by an expert's opinion. If you find that the opinion is not based on sufficient education or experience, that the reasons supporting the opinion are not sound, or that the opinion is outweighed by other evidence, you may completely or partially disregard the opinion. In other words, you should give the opinion the weight you think it deserves after you consider it along with all of the other evidence.

Later, on the morning of August 1, 2002, the jury sent two more notes to the trial judge. One said, "Deadlocked!" The other asked: "Can we have a magnifying glass to examine the fingerprints?" With respect to the magnifying glass note, defense counsel initially declared: "I think I might object to that. I don't know that even the expert using a magnifying glass could make a determination." As the trial judge and counsel discussed the notes and the judge appeared ready to send magnifying glasses to the jury, defense counsel elaborated on his objection:

> Your Honor, I think I would still have an objection to the magnifying glass, to any of them going back. I think part of that is because I don't know that—the same argument I made earlier; I don't know that [the] actual examiner used one, and I think it would be akin to doing their own vision, which they are not allowed to do that.

The trial court disagreed with defense counsel, saying: "That's not true. They actually are allowed to look at the fingerprints. That's one of the reasons they get the fingerprint card." Defense counsel responded: "I think the ability to enhance [the fingerprints] would take it beyond that. It would be almost like if they had a picture of the house and they couldn't see something, that they visited the scene." Again the trial court disagreed, stating: "I think it would be like if they had a picture

of the house and they wanted to magnify a particular portion of the picture." The trial court informed the jury that before it had an opportunity to respond to the deadlock question, it received the jury's request for magnifying glasses and decided "for the moment" to "set aside the note that said deadlocked" and to try to "find magnifying glasses." The court revealed that it had found three magnifying glasses and gave them to the jury.

Approximately thirty-five minutes later, the jury sent another note indicating "still deadlocked." The trial court requested suggestions from defense and government counsel, and indicated that her inclination was to give the deadlock instruction and let the jury go home. While the government wanted the jury to continue deliberating after the deadlock instruction was given, defense counsel stated that he "wouldn't be asking for a mistrial," and agreed with the trial court's proposed course of action. The government requested Alternative A of Instruction 2.91 from CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA (4th ed.1993), which the trial court gave to the jury without objection from defense counsel.[1] After the instruction, the jury was sent home and told to return at 9:30 a.m. the next morning.

On Friday, August 2, 2002, the trial judge called the parties together at 11:45 a.m. to inform them that she had received another note from the jury with the word "deadlocked." The judge broached the possibility of sending a note to the jury concerning "the possibility of reaching a decision." Defense counsel asserted: "[W]e would ask for that note to be sent to see if there are any additional things that could be done." The following note was sent to the jury at about 11:55 a.m.:

Ladies and gentlemen, is there any member of the jury that believes that further deliberations might lead to a unanimous verdict? Yes? No? Please check one.

Around 12:05 p.m., the trial court received a response from the jury with additional inquiries. After speaking with counsel, the court reconvened the jury to review and respond to the note. The jury answered the trial court's question about the possibility of further deliberations in the affirmative and asked for "three magic markers, particularly, red, blue, and black." These were provided to the jury.[2] At 5:00 p.m., the court received a note containing a "[r]equest to continue deliberations on Monday." The judge granted the request.[3] The jury reached its verdict on Monday, August 5, 2002, at 10:40 a.m.

■■■■ Having set forth the factual context for our analysis, we now turn to the applicable legal principles. Matters not received into evidence generally are viewed as "extrinsic" or as "new"; consequently, " 'the jury may consider only matter that has been received in evidence....' " *Edwards v. United States,*

---

1. Alternative A comes from the decision in *United States v. Thomas,* 146 U.S.App. D.C. 101, 108 n. 46, 449 F.2d 1177, 1184 n. 46 (1971) (en banc). Alternative B is the instruction set forth in *Winters, supra,* 317 A.2d 530.

2. The note also asked, "What time is lunch?" The judge revealed that lunch was scheduled for 12:30. In response to the jury's request for the defendant's arrest record, the judge stated, "you must make your decisions based on the evidence that is before you." And, in answer to the jury's request for "a clearer" and "a simpler definition" of reasonable doubt, the trial court repeated the reasonable doubt instruction.

3. Two other notes from individual jurors expressed concerns about meeting commitments later during the following week. The court told the jury it would "address those [notes] when and if necessary."

785 A.2d 292, 294 (D.C.2001) (quoting *United States v. Adams,* 385 F.2d 548, 550–51 (2d Cir.1967)). Furthermore, where, as here, the jury makes a formal request for a magnification device, which the trial court grants, "the use of a magnifying glass by jurors for exhibits properly introduced at trial is within the trial court's discretion."[4] *Boland v. Dolan,* 140 N.J. 174, 657 A.2d 1189, 1193 (1995) (citing *United States v. Brewer,* 783 F.2d 841, 843 (9th Cir.1986)).

■ Given these legal principles, our first inquiry is whether a magnifying glass constitutes extrinsic or new evidence. Several jurisdictions which have opined on this issue have concluded that it does not; in *Washington v. United States,* 881 A.2d 575 (D.C.2005), we favorably noted two of those cases. *Id.* at 583 (citing *United States v. George,* 56 F.3d 1078, 1084 (9th Cir.1995)) ("No 'new evidence' resulted from the jurors' use of a magnifying glass to examine the fingerprint cards and gun."); *Brewer, supra,* 783 F.2d at 843 ("We are unable to see how the use of the magnifying glass to view photographs differs from the use of corrective eyeglasses by jurors."). *Brewer* also declared: "We cannot accept the characterization of the magnifying glass used by the jury as extrinsic evidence." *Id.* (citation omitted); *see also State v. Walker,* 280 Mont. 346, 930 P.2d 60, 65 (1996) ("a jury's use of a magnification device does not constitute extrinsic evidence").

*Boland, supra,* referenced and discussed several decisions involving the use of a magnifying glass before concluding that: "The use of the magnifying glass by the jury did not constitute new evidence in this case." *Id.* at 657 A.2d at 1195. One rationale articulated in those cases for permitting a jury to use a magnifying glass centered on facilitating the jury's "more critical examination of the exhibits introduced at trial." *United States v. Young,* 814 F.2d 392, 395–96 (7th Cir.1987) (no plain error where judge allowed jury access to a magnifying glass for an unknown reason). Another, but similar, rationale focused on the similarity in function between a magnifying glass and eyeglasses; for example one court regarded the use of a magnifying glass by a juror as equivalent to "exchang[ing] his [or her] regular glasses for more powerful glasses to enable him [or her] to better see or more accurately determine the nature of the weld [a rewelding of the drive shaft of a tractor-trailer truck that caused an injury to persons on the highway,] or of the break [in the rewelded part]." *Western Spring Serv. Co., v. Andrew,* 229 F.2d 413, 419 (10th Cir.1956); *see also Falletti v. Brown & A.W. Claver,* 481 P.2d 744, 745 (Okla.1971) ("[C]ourts generally treat such use [of a magnifying glass] only as assistance to natural power of eyes of jurors to see, and not as additional evidence in the case.").[5]

---

4. Mr. Evans urges us to follow the standard of review set forth in *Vaughn v. United States,* 367 A.2d 1291, 1295 (D.C.1977). There, we said that: "[T]he proper standard for evaluating a claim of prejudicial error when an unauthorized object is inadvertently or mistakenly transmitted to the jury room is whether the judgment of the jury was 'substantially swayed' by the presence of the unauthorized evidence in the jury room." *Id.* at 1295 (footnote omitted). In this case, the magnifying glasses did not end up in the jury deliberation room through inadvertence or a mistake, but because the trial court made a decision in response to a specific jury request. Therefore, the appropriate standard of review in the first instance is abuse of discretion.

5. In fact, some persons may carry magnifying glasses in their pockets on a regular basis, or have them available on their desks at work, or at home as an aid to their natural vision.

We conclude in this case that the jury's requested use of a magnifying glass did not constitute extrinsic or new evidence. The jury's note stated the reason for the request: "Can we have a magnifying glass to examine the fingerprints?" From the note it is clear that the jury wanted to make a "more critical examination of the [fingerprint] exhibits introduced at trial," *Young, supra,* 814 F.2d at 396, and that the jury did not seek new or extrinsic evidence, *Boland, supra.*

Our second inquiry is whether the trial court abused its discretion in sending three magnifying glasses to the jury room. The record shows that the trial court sought the views of both defense and government counsel before deciding to send the jury the magnifying glasses. Defense counsel objected on two grounds—that the record did not reveal whether the expert fingerprint examiner had used a magnifying glass, and that permitting jury use of the device "would be almost like if they had a picture of the house and they couldn't see something, that they visited the scene." The trial court responded that jurors "are allowed to look at the fingerprints. That's one of the reasons they get the fingerprint cards." In addition, the trial court expressed a different view of defense counsel's use of the "picture of the house" analogy: "I think it would be like if they had a picture of the house and they wanted to magnify a particular portion of the picture." The trial court not only recognized that it had discretion, but also exercised that discretion after considering the alternatives of honoring or rejecting the jury's request; the factual basis for the court's exercise is clear on this record. Thus, the trial court's action in responding to the jury request comports with our mandate in *Johnson v. United States,* 398 A.2d 354 (D.C.1979). Consequently, there was no erroneous exercise of judicial discretion, and no violation of Mr. Evans'

Fifth and Sixth Amendment constitutional rights.

■ Even assuming an erroneous exercise of discretion in allowing the jury to use magnifying glasses, what we said in *Washington, supra,* a case in which the trial judge permitted a jury, at its request, to view the defendant up close, is applicable here. "[T]he error would be harmless." *Id.* at 583. This is so because the jury did not immediately return a verdict after being supplied with magnifying glasses, and there was compelling evidence of Mr. Evans' guilt. Indeed, the jury reported thirty-five minutes later that it was "still deadlocked." Nor did the jury reach a decision the following day. Thus, we can say, on this record, that the jury's "judgment was [not] substantially swayed" by the decision to allow the jury to use magnifying glasses to view the fingerprint card. *Id.* at 583 (citing *Barron v. United States,* 818 A.2d 987, 993 (D.C.2003)) (quoting *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

■ With respect to Mr. Evans' argument that the trial court coerced the verdict by sending the jury back for further deliberations after receiving three deadlock notes and giving a deadlock instruction, we agree with the government that this issue is subject to a plain error analysis since Mr. Evans did not object to the manner in which the trial court handled the deadlock notes. The first deadlock note was followed by a request for the magnifying glass, before the trial court had an opportunity to respond to the first deadlock note. Under that circumstance the trial court properly exercised its discretion in ignoring the first note and in providing the magnifying glasses. After the second deadlock note was received, defense counsel asserted that he "wouldn't be asking for a mistrial" and voiced no

objection to the trial judge giving the deadlock instruction and then sending the jury home until the following morning. When the third deadlock note was received, defense counsel specifically asked the trial judge to follow an alternative that the court had suggested, that is, to send a note to the jury asking whether there was "any member of the jury that believes that further deliberations might lead to a unanimous verdict?" When the jury responded, "Yes," and requested red, blue, and black magic markers, the trial court permitted further deliberations. At the end of the day, the jury sent a note asking to continue its deliberations during the next court session. In light of these circumstances, we are satisfied that the trial court did not plainly err in allowing the jury to continue its deliberations. *See Jones v. United States,* 813 A.2d 220, 224 (D.C.2002); *Johnson v. United States,* 360 A.2d 502, 504 (D.C.1976).

 Finally, Mr. Evans asserts that the evidence was insufficient beyond a reasonable doubt to convict him of the crime of burglary. We disagree. Officer Griffin's identification testimony was compelling, as was the evidence of Mr. Evans' fingerprint on the victim's key chain. And, Officer Corapinski's testimony concerning Mr. Evans' reaction as the officer observed him on the fire escape and when Mr. Evans was stopped, constituted some evidence of Mr. Evans' consciousness of guilt. We are satisfied that, viewed in the light most favorable to the government, the evidence was sufficient beyond a reasonable doubt to support Mr. Evans' first-degree burglary conviction. *See Beatty v. United States,* 544 A.2d 699, 701 (D.C.1988) ("We can only determine that the evidence is insufficient if we conclude, as a matter of law, that no reasonable juror acting reasonably, could convict on the evidence presented.") (citing

*Patterson v. United States,* 479 A.2d 335 (D.C.1984)).

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*